**NANKIN HOSPITAL, a Michigan non-profit hospital corporation, Plaintiff,**

v.

**MICHIGAN HOSPITAL SERVICE, a Michigan nonprofit corporation, et al., Defendants.**

**Civ. A. No. 32630.**

United States District Court, E. D. Michigan, S. D.

July 17, 1973.

---

Larry S. Davidow, Davidow & Davidow, Detroit, Mich., for plaintiff.

Grady Avant, Jr., Long, Preston, Evans & Kinnaird, Detroit, Mich., and Harold F. Baker, Washington, D. C., for defendants.

## MEMORANDUM OPINION

*(Findings of Fact—
Conclusions of Law)*

DeMASCIO, District Judge.

■ The defendant, Michigan Hospital Service Corporation (Blue Cross), is in the business of insuring pre-paid hospital care for its subscribers. It was incorporated pursuant to Act 109 (Public Acts 1939, M.C.L.A. § 550.501 et seq.) which provides for the establishment and regulation of nonprofit hospital service corporations.[1] The clear intent of Act 109 is to provide a voluntary nonprofit plan for financing health care at the lowest possible cost. To that end, hospital service corporations are subject to detailed regulation by the Michigan Commissioner of Insurance.[2] For example, Act 109 provides that ". . . the rates charged to subscribers for hospital service, and the rates of payment by such corporation to the contracting hospitals, shall at all times be subject to the approval of the commissioner of insurance." (Sect. 3.) Act 109 also restricts the class of hospitals with which a hospital service corporation may contract. Specifically, Blue Cross may "enter into contracts for the rendering of hospital service to any of its subscribers only with hospitals maintained by the state, or any of its political subdivisions . . . or . . . a non-profit corporation . . ." (Sect. 3). Nonprofit hospitals which have such contracts with Blue Cross are referred to as participating hospitals.[3]

1. The Act is prefaced:
"An Act to provide for and to *regulate* the incorporation of non-profit hospital service corporations; to provide for the *supervision and regulation* of such corporations by the state commissioner of insurance; and to proscribe penalties for the violation of the provisions of this act."
Section 1 of the Act then provides in part:
". . . any such non-profit hospital service corporation *shall be subject to regulation and supervision* by the commissioner of insurance, as hereinafter provided." (Emphasis added.)

2. The Act provides:
 (a) That the Commissioner shall approve the articles of incorporation and by-laws of such corporation (Sects. 4–6);
 (b) For approval of ". . . all acquisition and administrative expenses . . ." in connection with its operation (Sect. 12);
 (c) The Commissioner "shall have the power of visitation and examination into the affairs . . ." of any such corporation and free access to all books, papers, and documents (Sect. 7);
 (d) That the Commissioner may summon and examine witnesses under oath and examine corporation officers, agents, or employees (Sect. 7);
 (e) That the corporation pay . . . the travel and other necessary expenses of the Commissioner incurred in such investigations into the affairs of the corporation (Sect. 7);
 (f) That corporations under the Act are required to file verified financial statements and the Commissioner is "empowered to suspend the certificate . . ." until such statement is properly filed" (Sect. 8);
 (g) The Commissioner is authorized to determine the form and amount of reserves maintained by such corporations (Sect. 9);
 (h) That participating hospitals, physicians, and the public shall be represented on the Board of Trustees (Sect. 2);
 (i) That the Commissioner has the power to revoke any certificate issued under the Act (Sect. 6).

3. The Act is permissive in its terms. It provides that a service corporation "may" enter into contracts with a defined class of hospitals. Act 109 also

In 1951, Dr. Rene Archambault purchased Nankin Hospital, a two-story structure located in Wayne County, Michigan. The hospital can accommodate 43 bed patients (TR 1304–05) [4] and houses Dr. Archambault's Industrial and General Clinics. The hospital and general clinic share the same entrance and lobby, and have identical telephone numbers [5] (TR 1307–08, 1321–23). From 1952 until terminated in 1966, Nankin was a participating Blue Cross hospital. As a consequence of that termination, Nankin filed this antitrust action claiming that defendants [6] violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[7]

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

> "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."

Section 2 of the Sherman Act, 15 U.S.C. § 2, defines as a misdemeanor the act of any person:

> ". . . who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States. . . ."

During the trial, defendants moved, pursuant to Fed.R.Civ.P. 12, to dismiss the action on the following grounds: (1) failure to prove restraint of trade under Section 1 of the Sherman Act; (2) failure to prove a monopoly under Section 2 of the Sherman Act; and (3) lack of subject matter jurisdiction because defendants' acts (a) have not affected or substantially restrained plaintiff's interstate trade or commerce; (b) are excepted from antitrust actions under the McCarran-Ferguson Act; and (c) were regulated by the Hospital Service Corporation Act and therefore constitute "state action" not subject to antitrust regulations. In order to resolve these issues additional facts as found by the court are set forth.[8]

Prior to 1963, any hospital with a nonprofit charter was accepted as a participating hospital by Blue Cross (TR 362). However, with concern over rising costs of hospital care between 1950 and 1960, the Insurance Commissioner required Blue Cross to adopt certain procedures and standards for the protection of its subscribers (Def.Exh.

---

provides that hospital service corporations "may" provide for furnishing hospital service to subscribers in cases of emergency in non-participating hospitals. (Sect. 6.)

4. References are to the trial transcript.

5. A dwelling behind the hospital, also owned by Dr. Archambault, is connected by an underground passage. The basement of the house is used for a hospital workshop and the attic is used for hospital storage. Dr. Archambault resides in the remainder of the dwelling. A second dwelling, owned by Dr. Archambault, is the residence of Dr. Archambault's physician-employee.

6. The defendant Greater Detroit Area Hospital Council (GDAHC) is a Michigan Non-Profit Corporation. GDAHC provides planning services for the Comprehensive Health Planning Council for Southeastern Michigan, which has been designated a (b) agency pursuant to the Partnership for Health Act, 42 U.S.C. § 246(b). GDAHC receives funds pursuant to this Act and from public grants.

The defendants J. W. Paynter, F. B. Hunt and William McNary are or were members of the Blue Cross Board of Trustees when this action was started.

Defendant D. Eugene Sibery was Executive Director and Secretary of defendant GDAHC when this action was commenced. (Mr. McNary has since retired from Blue Cross and is a member of the Board of Trustees of GDAHC.)

7. Allegations in the complaint relating to violations of the Health Insurance for Aged Act, 42 U.S.C. § 1395 et seq., were dismissed with prejudice on November 23, 1970, by another Judge in this District.

8. Blue Cross's counterclaim was resolved during pre-trial conferences and will not be included as part of our findings of fact.

40, p. 2).[9] Blue Cross adopted a tentative set of qualification standards on January 28, 1960 (Def.Exh. 19) and, on October 10, 1962, participating hospitals were notified that the standards had received final approval (Def.Exh. 30).[10] The pertinent standards provided that: (a) a participating hospital must be a community supported or a voluntary or tax-supported general hospital and must be responsive to community needs; (b) the governing body of the hospital must be responsible for the operation of the hospital; (c) the responsibility for administration of the hospital must be vested in an administrator responsible only to the governing board; and (d) the hospital must be owned and operated by a nonprofit corporation or by the State of Michigan.[11] In light of these standards, which we find to be reasonable, Blue Cross surveyed its participating hospitals (TR 467–68) and determined that Nankin did not meet the qualifications.[12] Blue Cross then engaged in negotiations with Nankin to maintain it as a contracting hospital. Blue Cross finally notified Nankin that its participating status would be terminated unless, within six months, Nankin

complied with the qualification standards (Def.Exh. 48, p. 4). After several extensions (Def.Exh. 57, 63–67) Nankin was granted a participating contract for one year conditioned upon the employment of a full-time administrator (Def. Exh. 73–75), and Nankin was advised that Dr. Archambault could not continue as the administrator or serve on the Board of Directors (Def.Exh. 70, 76 TR 544, 670). In an attempt to conform to the standards, Dr. Archambault suggested that he would sell Nankin's facilities to the corporation. Despite Nankin's failure to comply at the end of this one-year contract, Blue Cross again extended the contract for 90 days to permit Nankin to complete the changes it had promised. At the end of this 90 day period, the contract was not extended (Def.Exh. 121).

It is clear on this record that Blue Cross had ample basis for withdrawing Nankin's participating status. Dr. Archambault is the treasurer and full-time administrator of Nankin.[13] He alone controls Nankin's finances and may draw funds in any amount "as long as it does not create an insolvency." (TR 911–13, 1108–10.) [14] As administrator,

9. The Commissioner in part required that participating hospitals maintain an effective cost accounting system and a committee to review hospital utilization policies.

10. From 1959–1963, Blue Cross developed two sets of qualification standards. One pertained to a new admission as a participating hospital (5/25/61), and the other pertained to hospitals already participating in the Blue Cross Plan (4/26/72) (Def.Exh. 37, 38). After adoption of the standards, they were explained to all participating hospital administrators (Def.Exh. 28). In his Rate Determination of March 24, 1965, the Insurance Commissioner approved the Blue Cross Qualification Standards (Def.Exh. 31, 33, 36, 40, 41 p. 10).

11. Blue Cross defined nonprofit to mean a community sponsored hospital that is nonproprietary and represented community rather than private interests. Municipal, state, and religious hospitals were considered community hospitals (Def.Exh. 5, p. 2).

12. For example, the inquiry disclosed that Nankin and its service departments were owned and operated by Dr. Archambault; that the Board of Directors of Nankin was completely inactive (Def. Exh. 47); and that Nankin lost its accreditation. Additionally, Nankin failed to develop a cost accounting system as required of participating hospitals (Def. Exh. 40, p. 3).

13. Dr. Archambault insists that he is qualified to act as an administrator (Pl. Brief, p. 1). And he may well be. But this overlooks the conflict of interest problem present in this arrangement. The standards require that the hospital administrator be responsive to the governing board. Under Nankin's corporate structure, Dr. Archambault could never be.

14. One Board member thought that since the hospital was indebted to Dr. Archambault on a land contract, the Board should not control the Doctor's use of hospital funds (TR 911). Another

for which he receives a salary,[15] he exercises complete authority over the hospital employees.[16] Dr. Archambault continually refused to hire an independent administrator even though an administrator's salary would be included in the costs reimbursed by Blue Cross.[17]

With respect to the nonprofit character of Nankin, the following facts are relevant.[18] Dr. Archambault owned the hospital's laboratory and derived substantial income from the sale of laboratory services to the hospital (Def. Exh. 229, 231; TR 1387–90). He also owned the hospital pharmacy. From this pharmacy, Dr. Archambault obtained drugs which he sold at a profit to his clinic patients (TR 1355, 1507–08, 1522–23). Dr. Archambault did not reimburse the hospital in cash for the drugs obtained. Rather, the cost of the drugs he obtained was debited to a hospital account payable to him.

The hospital also paid Dr. Archambault for anesthesia services (TR 1430–32) and for parking and storage facilities (TR 1466–67). The Nankin medical staff were all employees of Dr. Archambault including a full-time physician and a number of part-time doctors (TR 1331–43). The record further discloses that Dr. Archambault performed substantially all of the surgery (TR 1342, Def. Exh. 132) and that he and the full-time doctor were the only physicians authorized to admit patients to Nankin (TR 902–03, 1335–36).[19] Dr. Archambault not only decided whether the patient should be admitted but also the length of stay. After admission, all patients, even those admitted by the full-time physician, were considered as Dr. Archambault's (TR 1335). Fees received by the full-time physician, were deposited to Dr. Archambault's personal account (TR 1326–27). It is also clear that the income of the hospital as well as that of Dr. Archambault was dependent upon admissions (TR 1559–60). Further, it is noteworthy that Nankin's application for a charitable exemption under Section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. § 501(c)(3)) was, on four occasions, denied on the ground that Nankin was operated for Dr. Archambault's personal benefit (Def.Exh. 168, 169, 170; TR 1481–82, 1487–88). After the first denial by the Internal Revenue Service, Dr. Archambault restructured Nankin's Board of Directors. The new Board consisted of seven members, each was either a friend, patient, legal counsel, business associate or employee of Dr. Archambault.[20] It was

Board member treated Dr. Archambault as the owner (TR 845).

15. The salary Dr. Archambault received cannot be determined with accuracy. The records show payment in the amount of $6,000 annually. However, the Board minutes authorize an increase from $7,-200 to $9,000 per year (Def. Exh. 208). It appears that he was receiving $9,200 per year (TR 1393).

16. Dr. Archambault hired and discharged employees at will. The President and Chairman of the Board testified that he did not interfere with the management of Nankin and further that "as administrator he [Dr. Archambault] was qualified to handle the management of the hospital." (TR 951)

17. Blue Cross's formula for payment to participating hospitals is 102% of cognizable costs.

18. To determine whether a corporation is truly nonprofit, a court will examine its charter and the manner in which the business is conducted. Bruce v. Henry Ford Hospital, 254 Mich. 394, 399–400, 236 N.W. 813 (1931); Cibor v. Oakwood Hospital, 14 Mich.App. 1, 7, 165 N.W.2d 326 (1968).

19. In 1964, Dr. Archambault or his physician-employee accounted for 99.1% of all Blue Cross subscriber patients admitted to Nankin and in 1965 Dr. Archambault accounted for 99.7% of all admissions (Def. Exh. 132).

20. Nankin's Articles of Incorporation listed Dr. Archambault, his wife and his brother as the original members of the corporation. They had exclusive authority to increase the number of Board members. Until 1957, the Board of Directors consisted of Dr. Archambault, his former wife, his father-in-law, and his brother (TR 1226).

thus apparent after restructuring that Dr. Archambault continued to control the Board of Directors.[21] In December 1971, the Internal Revenue Service denied Nankin's fourth application for a Section 501(c)(3) exemption because:

" . . . a hospital controlled by doctors who limit the care provided by the hospital to their own patients and where use of the hospital by other doctors is unsubstantial is a hospital which does not qualify for exemption under § 501(c)(3). . . ." (Def. Exh. 184)

The extent of Dr. Archambault's control and financial interest in Nankin is most clearly demonstrated by the negotiations for a land contract evidencing his sale of Nankin's facilities to the Corporation. As noted above, Dr. Archambault suggested such a transfer as a compromise to Blue Cross (supra, p. 7).

The first land contract was dated February 1, 1965. The Board of Directors agreed to accept the contract at the value appraised by Dr. Archambault of $449,000 (TR 1411–12) but this contract was never executed because Mrs. Archambault refused to sign (Def.Exh. 69; TR 1415). The face amount of the land contract was later questioned by Blue Cross resulting in an independent appraisal which valued the land and building at $325,800. The original contract was canceled on July 13, 1965, upon submission of the appraiser's report and a new one supposedly executed.[22] Both this contract and the original purported-

ly provided for a $1,000 downpayment with the balance to be paid in monthly installments of $3,900 (Def.Exh. 171; TR 1425–26). However, no one, including Nankin's auditors (Def.Exh. 172), has ever seen the second contract reflecting the face amount of $353,800.[23] Nonetheless, the records at Nankin are maintained as though this second contract existed, and Nankin has been crediting $20,000 annually to Dr. Archambault's account as interest.[24] Finally, we note that as recently as 1968 when Nankin renewed its application for reinstatement, Dr. Archambault was still the administrator, chief of staff, treasurer, admitting physician, and the owner of the ancillary services (Def.Exh. 129; TR 874). It is apparent that Nankin is still a proprietary hospital operated for the profit of Dr. Archambault. Act 109 precludes the opportunity for profit in the delivery of hospital care. Nankin brought about its own termination by refusing to comply with the Blue Cross qualification standards promulgated pursuant to the mandate of Act 109.

■■■■ Dr. Archambault does not deny that the operation of Nankin Hospital is inextricably intertwined with his practice. Rather, he states: "The matter of . . . conducting his own private practice on the hospital premises, the areas used for that purpose, the operation of various departments—pharmacy, X-ray and laboratory—were known to and approved by Michigan Hospital Service, all of which have been and

21. Nankin's By-Laws provided for annual Board meetings with provision for special meetings if circumstances required. Whenever the Board did meet, it never disagreed with proposals made by Dr. Archambault (TR 833–34, 866–67, 951–52).

22. The Board of Directors did not question the appraisal made by Dr. Archambault of $449,000. They also accepted the amount submitted by the independent appraiser and agreed to enter into a new contract in the amount of $353,800 consisting of $325,800 for land and building and personal property valued at $28,000 (Def. Exh. 217).

23. The revised contract was not produced at trial despite a specific request by the court.

24. This accrual of annual interest replaced a like amount Dr. Archambault received from a lease of the hospital facilities to Nankin (Def. Exh. 229; TR 1395–1402, 1605). This rental fluctuated, and it is apparent that Dr. Archambault could and did unilaterally increase the amount when he so desired. By debit to this account, cost of salaries to his employees and payment for the supplies and drugs Dr. Archambault obtained from the Nankin pharmacy are made (supra, p. 9) (TR 1507–08, 1521–23).

are pretty much the same over the years up to an including now." (Pl. Brief, p. 1–2.) Plaintiff argues that Blue Cross is estopped from challenging Nankin's status as a nonprofit hospital by reason of past knowledge (TR 9/14/72, p. 88).[25] We find this argument untenable. To apply estoppel under these circumstances would create an unintended, perhaps irrebuttable, presumption that a nonprofit corporation never changes in nature. It would also divest the Insurance Commissioner of · his statutory authority to supervise and regulate contracts for the delivery of hospital care.

## SHERMAN ACT—SECTION 1

██ Plaintiff has not established a restraint of trade in violation of Section 1 of the Sherman Act. Nankin had the burden of proving that Blue Cross's standards were adopted for anti-competitive reasons. When a nonprofit corporation promulgates standards designed primarily to promote the public welfare and not to lessen competition, the resulting restraint, if any, is reasonable and therefore not violative of the Sherman Act. Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Roofire Alarm Co. v. Royal Indemnity Co., 313 F.2d 635 (6th Cir. 1963), cert. denied, 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963); Marjorie Webster Junior College v. Middle States Association of Colleges and Secondary Schools, 139 U. S.App.D.C. 217, 432 F.2d 650 (1970); Deesen v. Professional Golfers' Association of America, 358 F.2d 165 (9th Cir. 1966).[26] Since Act 109 defines the hospitals with which Blue Cross may contract and eliminates profit from the delivery of hospital care, some restraint is inherent in its terms. A resultant restraint, if any, is not actionable under the Sherman Act. The refusal by Blue Cross to do business with a hospital that does not qualify for participation is not an actionable violation of the Sherman Act. Winn Avenue Warehouse v. Winchester Tobacco Warehouse Co., 339 F. 2d 277 (6th Cir. 1964).

██ Nor has plaintiff established a conspiracy in violation of Section 1. Plaintiff asserts that from 1954 to the latter part of 1965, Nankin enjoyed ". . . the knowing approval of defendant Michigan Hospital Service, Michigan Department of Public Health, U. S. Department of Health, Education and Welfare and the approval of the Joint Commission on Accreditation. . . . ." Thereafter, plaintiff continues, various high officials associated with Blue Cross and GDAHC obtained substantial positions of influence with various agencies and ". . . contemporaneous attacks were made upon plaintiff including conduct on the part of these organizations to put plaintiff out of business.[27]" Plaintiff reasons that

25. Relying upon DeGroot v. Edison Institute, 306 Mich. 339, 10 N.W.2d 907 (1943); In re Dearborn Clinic and Diagnostic Hospital, 342 Mich. 673, 71 N.W. 2d 212 (1955); Podvin v. St. Joseph Hospital, 369 Mich. 65, 119 N.W.2d 108 (1963); Oakwood Hospital v. State Tax Commission, 374 Mich. 524, 132 N.W.2d 634 (1965), Nankin further argues that its nonprofit corporate structure is not subject to collateral attack (TR 9/14/72, p. 62). But in each of these cases, the court found as a matter of fact from the evidence presented that the hospitals were nonprofit organizations. In any event, the argument in this case is entirely without merit. Nankin would also argue that the contract between Blue Cross and itself denotes Blue Cross as the agent and an agent as a matter of black letter law may not inquire into or control the principal in the operation of the principal's business. This argument flies in the face of Act 109 and is rejected.

26. The District Court in Roofire Alarm Co. v. Royal Indemnity, supra, held that the Sherman Act is not intended to reach normal and usual contracts or combinations which are incidental to lawful purposes and are intended to further legitimate trade.

27. Plaintiff points out that defendant D. Eugene Sibery, former Director of Hospital Affairs, became a Director of defendant GDAHC and now is an official of National Blue Cross; William S. Mc-

**1208**

this chain ". . . of adverse and condemnatory conduct can only be explained [by a conspiracy] . . . to put plaintiff Nankin out of business." (Pl. Brief p. 45.) Nankin evidentally views the loss of its hospital license, its failure to obtain a federal tax exemption and its loss of accreditation as results of the alleged conspiracy.

While a conspiracy may be proven by circumstantial evidence, this plaintiff has not submitted sufficient proof to establish inferentially or otherwise that a conspiracy exists. Dr. Archambault is the only witness who testified to an alleged conspiracy. He testified ". . . I believe there has been infiltration of the health department by former Blue Cross personnel, and I believe that the Greater Detroit Hospital authority having a director who was formerly associated with Mr. McNary would carry the policies of Mr. McNary and of Blue Cross . . . the policies of Blue Cross, the policies of the Greater Detroit Area Hospital and the policies of the Michigan Health Department seem to have the same direction or the same aim and the same purpose . . . they would like to form large medical centers and in order to achieve this they have to eliminate the smaller hospitals, again in my opinion, . . . subjugate the doctors to the same status as other employees in the hospital. . . ." (TR 1578–95.) But merely assuming, as plaintiff apparently does, that all the officials associated together in the hospital insurance field or in hos-

pital administration are of the belief that small hospitals no longer play a viable role, falls far short of establishing a conspiracy.

Nor is plaintiff's position bolstered by its argument that the qualification standards were merely a vehicle employed by the conspirators to drive Nankin and other small hospitals out of business. Nankin viewed the standards as unreasonable (TR 1563–64) and part of a "program of harrassment". But Nankin neglects to acknowledge that the standards were approved by the Insurance Commissioner and were clearly responsive to the goals anticipated by Act 109.[28]

## SHERMAN ACT—SECTION 2

 Nankin next asserts a violation of Section 2 of the Sherman Act. To establish a violation of this Section, Nankin must prove that Blue Cross has: (1) the power to control prices or exclude competition in a relevant product market; and (2) the acquisition of monopolistic power as contrasted with growth or development as a consequence of a superior product. Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); American Tobacco v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). See also United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).[29] Of course, monopoly power condemned by

Nary, former President of Blue Cross when Nankin's contract was canceled, became Director of GDAHC; J. W. Paynter and F. B. Hunt became Board Members of Blue Cross; Dr. Edwin Harmon, former Director of Blue Cross, became Director of Michigan Department of Public Health after which Nankin was refused a hospital license; J. A. Barth was Executive Vice President of Michigan Hospital Service. Neither Dr. Harmon nor Mr. Barth are defendants or co-conspirators in this action.

28. Plaintiff states that the standards were ". . . just a front behind which defendants operated and carried on the de-

termination to put plaintiff and other small hospitals out of business." (Pl. Brief, p. 8.)

29. These cases are cited in the report of the Attorney General's National Committee Study, March 31, 1955, p. 43, to support the observation that: "Monopoly power over price may derive from control of a sufficiently large part of a product's available supply in a distinguishable market, or from control of some strategic aspect of the market. Courts have summed up monopoly earmarks as the power to control market prices or exclude competition." It is not necessary to show that prices have been raised or competi-

Section 2 must be measured within the confines of a relevant product market which in this case is the delivery of pre-paid hospital care.[30] Although a plaintiff may show that an alleged monopolist has the power to raise prices or exclude competition by virtue of its share of the market, Nankin's allegation, based upon "information and belief" that Blue Cross has 70% to 80% of the relevant market is insufficient to support an inference that Blue Cross possesses such power.[31] Blue Cross submitted evidence establishing that its actual share of the market did not exceed 50%. Moreover, Blue Cross offered proof that commercial insurance companies not only share a sizeable portion of the relevant product market but that they also have been able to obtain the coverage for substantial corporations (Def.Exh. 152–154). We find that the market share attributed to Blue Cross is not sufficient to earmark monopoly power. United States v. Aluminum Company of America, supra; Hiland Dairy, Inc. v. Kroger Company, 402 F.2d 968, 974 (8th Cir. 1968); United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

Nankin continues with the assertions that Blue Cross arbitrarily fixes rates for participating hospitals;[32] that by fixing and maintaining at a high price level hospital services for participating hospitals, Blue Cross has injured and lessened the business of plaintiff (Complaint, para. 12); that Blue Cross has caused the public to believe that participating hospitals are qualified and non-participating hospitals are not- thereby creating a monopoly for participating hospitals (Complaint para. 3); and that Blue Cross through close association with GDAHC, which screens the applications from which Blue Cross on recommendation then accepts participating hospitals, is able to gain virtual control and monopoly of hospitals (Pl. Brief, p. 44).

We cannot agree with Nankin that Blue Cross possesses the power to fix prices or exclude competition. Act 109 vests the power to fix rates in the Insurance Commissioner (Sect. 3). Blue Cross may petition for rate increases but the final determination is reserved for the Insurance Commissioner.[33] In Travelers Insurance Co. v. Blue Cross of

---

tion actually excluded. It is only necessary to show that a person has the power to bring about this result. United States v. Aluminum Company of America, 148 F.2d 416, 428 (2nd Cir. 1945).

30. See footnote 29, supra.

"Although the word 'market' does not appear in the statute, it is a necessary element of the concepts of monopoly and of certain restraints of trade upon which the statute rests." Attorney General's National Committee Study, March 31, 1955, p. 44.

31. To support this allegation, Nankin called a witness who testified that Blue Cross possessed 70% of the relevant product market. But he was neither qualified as an expert nor did he produce underlying documents to support his testimony. We therefore cannot attach probative value to this assertion.

32. Nankin alleges that nonparticipating hospitals are discriminated against because payment to participating hospitals is $40 or more per bed per day, while payment to nonparticipating hospitals is $15 per bed per day, and that Blue Cross

refuses to consider real cost incurred by nonparticipating hospitals resulting in discrimination against plaintiff which amounts to unfair competition.

33. Nor has the Michigan Insurance Commissioner hesitated to exercise his authority to control rates. On March 24, 1965, in a written determination, the Insurance Commissioner stated: "Finally, it was clearly the intention of the legislature in adopting the Blue Cross Enabling Act in 1939 that the Insurance Commissioner should approve the premiums charged by the plan. *The Insurance Commissioner's authority over rates must be maintained,* since this authority is a major form of protection for the Plan's subscribers. I am, therefore, disapproving the experience rating formula proposed by the plan management, on the grounds that it contains factors for automatic adjustments in rates without the requirement of my prior approval. *I am directing that another formula be used which will preserve the Commissioner's authority as specified by the legislature."* (Emphasis added) (Def. Exh. 41, p. 15)

Western Pennsylvania, 361 F.Supp. 774 (W.D.Pa., 1972), the court stated:

> "Blue Cross is not a monopolist, for it not only lacks control over the rate-making effects normally incidental to lawful competition, but is without power to establish its own rates. . . ."

Nor is it possible for Blue Cross to acquire the power to eliminate competition. To the contrary, Blue Cross unlike commercial insurance companies, must accept all groups at the rate determined by the Insurance Commissioner.[34]

Section 2 of the Sherman Act further prohibits a combination or conspiracy to monopolize. Nankin's proofs, like those offered under Section 1, have failed to establish an unlawful agreement or combination to violate Section 2 of the Sherman Act. Nankin alleges no more than the fact that GDAHC performs its assigned function of investigating the facilities of a hospital applying for participation.

SUBJECT MATTER JURISDICTION

▆▆▆▆ Finally, Nankin's proofs fail in several particulars to meet the jurisdictional requirements of the Sherman Act. First, any restraint unlawful under Section 1, or any monopoly or attempt to monopolize unlawful under Section 2, must detrimentally affect plaintiff's "trade or commerce among the several States." In Page v. Work, 290 F.2d 323, 330 (9th Cir. 1961), cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed. 2d 76, the court pointed out that:

> " . . . the test of jurisdiction is not that the acts complained of af-

fect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business."

We have already noted Nankin's "sale of hospital services" is limited to patients of Dr. Archambault who reside in Wayne County.[35] We find that Nankin is not engaged in interstate commerce nor has it demonstrated that its sale of hospital services has any effect on interstate commerce. Assuming Nankin could demonstrate, and it has not, that a significant number of patients reside outside the state, it would still be excluded from interstate commerce since the sale of hospital care is personal and localized in nature. Riggall v. Washington County Medical Society, 249 F.2d 266 (8th Cir. 1957); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8th Cir., 1959); Spears Free Clinic and Hospital v. Cleere, 197 F.2d 125 (10th Cir. 1952). Cf. Marston v. Ann Arbor Property Managers Association, 422 F. 2d 836 (6th Cir. 1970); Hotel Phillips, Inc. v. Journeymen Barbers, 301 F.2d 443 (8th Cir. 1962); John Kalin Funeral Homes, Inc. v. Fultz, 313 F.Supp. 435 (W.D.Wash., 1970), aff'd, 442 F.2d 1342 (9th Cir. 1971).

A second jurisdictional barrier concerns the exception to antitrust liability created by the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. The Act sets forth as policy that:

> " . . . the continued regulation . . . by the several States of the business of insurance is in the public interest. . . ." (15 U.S.C. § 1011)

---

34. The Insurance Code of 1956 provides that commercial insurance companies seeking to do business in the State of Michigan must seek a certificate of authority from the Insurance Commissioner. (M.C.L.A. § 500.402 et seq.) The Insurance Code thereafter grants to the Insurance Commissioner supervisory authority over commercial insurance companies. Commercial insurance companies thereafter are free to choose the risks they wish to accept and determine the rates to be charged for their acceptance.

35. To determine the effect on interstate commerce of its alleged conduct, Blue Cross sought and the court granted an order requiring Nankin to produce the admissions records for 1960–1970. Nankin produced 19 patient records reflecting 14 different patients. Only one appears to have an out-of-state address.

To this end, the Act provides that:

"The business of insurance . . . shall be subject to the laws of the several States. . . ." (15 U.S.C. § 1012(a))

and that:

"No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . provided that . . . the Sherman Act . . . the Clayton Act . . . the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance *to the extent that such business is not regulated by State law.*" (15 U.S.C. § 1012(b))

Thus, the McCarran Act grants to the states the authority to regulate "the business of insurance" and the "acts in conduct thereof." Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); Securities and Exchange Commission v. Variable Annuity Life Insurance Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). To come within the McCarran exception to the antitrust laws defendant need only show that it is engaged in the "business of insurance" and that "such business is . . . regulated by state law." Travelers Insurance v. Blue Cross of Western Pennsylvania, supra; Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); Prudential Insurance Co. v. Benjamin, supra. We find that Blue Cross has proven both of these requirements.

The basic function of Blue Cross of providing pre-paid hospital care is clearly "the business of insurance." And the negotiation of contracts with nonprofit hospitals as regulated by Act 109 constitutes "acts in the conduct" of such business. Enforcement of the qualification standards adopted by Blue Cross and approved by the Insurance Commissioner pursuant to statute is also an "act in the conduct" of Blue Cross's insurance business. In fact, Act 109 subjects every critical facet of Blue Cross's business to regulation of the Insurance Commissioner. Although Nankin does not question the fact that Blue Cross is in the insurance business, it argues that the McCarran Act exemption is not applicable because " . . . Blue Cross is not subjected to the approval of the Commissioner of Insurance insofar as Nankin is concerned." This is so, plaintiff reasons, because Nankin has been classified as a nonparticipating hospital and is barred from contracting with Blue Cross (Pl. Brief, p. 12–13). Nankin appears to be arguing that its relationship to Blue Cross, because it was denied a participating contract, is not regulated by state law and is therefore exempt from the usual McCarran Act exception. This argument is inconsistent with Nankin's allegation that Blue Cross's denial of participation imposed a restraint upon Nankin and created a monopoly in violation of the Sherman Act. In any event, it does not remove Blue Cross from the McCarran exception. In order to take the case out of that exception, Nankin must prove a restraint or monopoly through "boycott", "coercion" or "intimidation." 15 U.S.C. § 1013(b). Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178, 1181 (6th Cir. 1971); Securities & Exchange Commission v. National Securities, Inc., 393 U.S. 453, 84 S.Ct. 564, 21 L.Ed.2d 668 (1969); Travelers Insurance v. Blue Cross of Western Pennsylvania, supra; Miley v. John Hancock Mutual Life Insurance Co., 242 F.2d 758 (1st Cir. 1957). No such evidence was introduced at the trial.

It is therefore ordered that the defendants' Motion to Dismiss is hereby granted.