**Donald L. ANGLIN, Appellant,**

v.

**BLUE SHIELD OF VIRGINIA and Blue Cross of Virginia, Appellees.**

No. 81–1246.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1981.

Decided Nov. 10, 1982.

Craig T. Redinger, Charlottesville, Va. (Lowe, Gordon, Jacobs & Redinger, Charlottesville, Va., on brief), for appellant.

R. Gordon Smith, Richmond, Va. (J. Robert Brame, III, Gilbert E. Schill, Jr., James H. Walsh, R. Brian Ball, McGuire, Woods & Battle, Richmond, Va., on brief), for appellees.

Before BUTZNER, RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

The plaintiff in this action is an individual who sought to purchase a health insurance policy from the defendants for himself and a minor son. The plaintiff did not wish coverage for his wife who had other health insurance as a result of her employment. The defendants offer only a policy that would cover plaintiff, his wife, and son. Under defendant's rule, plaintiff must enroll according to his marital status.[1] Plaintiff brought suit alleging that requiring him to purchase a policy to include his wife resulted from violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. The district court, 510 F.Supp. 75, granted defendant's motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), and we affirm.

Defendants are non-stock Virginia corporations known commonly as the "Blues." They are organized under Title 38.1 of the Virginia Code, styled "Insurance," §§ 38.1–810 to 834, to provide hospital and medical and surgical services through the sale of prepaid subscriber contracts to individuals and groups. Blue Cross has member hospitals, while Blue Shield has member physicians providing services. Id. §§ 38.1–810, 811. While the entities are legally distinct, they offer joint coverage, and the administration for both programs is handled by Blue Cross. Id. § 38.1–812. The defendants assert that they are immune from the suit at bar under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1013, which exempts State regulated aspects of "the business of insurance" from federal antitrust law.[2]

We consider two principal issues in deciding whether the plaintiff's complaint concerns the "business of insurance." First, there is the issue of whether or not Blue Cross/Blue Shield may ever be considered to be carrying on the business of insurance. If that issue is answered affirmatively, then we must consider whether the particular relationship at hand between the plaintiff

---

1. Defendants apparently argued in the court below that they enroll subscribers under a "true family status" rule which requires enrollment according to marital status. While they apparently allowed an individual to enroll in a plan covering only himself, if the individual wishes coverage for additional family members, coverage must be purchased for the entire family except under limited circumstances. Defendants asserted that this policy derives from their practice of "community rating" which is a method of setting rates so that subscribers in a definable affinity group pay the same rate regardless of the risk represented by individual applicants for coverage. "Community rating" ostensibly reduces costs by eliminating pre-enrollment physical examinations and reducing administrative expenses.

   Plaintiff, in his brief in this court, on p. 6, takes exception to the district court's mention of certain facts in its opinion as coming from defendant's brief and oral argument rather than from the complaint. While plaintiff does not now, and apparently did not in the trial court, bother to deny these facts, to avoid further controversy we will not refer to them other than in this footnote. In all events, we think the district court's reference to those facts was entirely harmless, if error at all. We also believe that most, or perhaps all, of the facts objected to, are matters of public record because defendants must file with the State Corporation Commission, which is the controlling regulatory authority, their "... rate manual showing rates, rules and classification of risks applicable thereto...." as well as a copy of the form of each policy. Va.Code § 38.1–342.1.

2. The McCarran-Ferguson Act provides, in part:

   § 2(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax on that business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

   · · · · ·

   § 3(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

   15 U.S.C. §§ 1012(b), 1013(b).

and defendants concerns the business of insurance.

■ The question of whether various aspects of Blue Cross/Blue Shield operations come within the McCarran-Ferguson Act has been litigated many times. *E.g., Group Health & Life Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); *Virginia Academy of Clinical Psychologists v. Blue Shield,* 624 F.2d 476 (4th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). Until recently some decisions had almost assumed that under certain circumstances Blue Cross/Blue Shield could be characterized as carrying on the business of insurance. *See Travelers Insurance Co.,* 481 F.2d at 83; *Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199, 1211 (E.D.Mich.1973). The Supreme Court opinion in *Royal Drug,* however, altered the efficacy of that position, for it reasoned that the particular relationship being questioned had to be examined in each case.

The alleged underlying antitrust violation in *Royal Drug* was Texas Blue Shield's policy of limiting reimbursement to cost plus $2 for prescriptions filled by pharmacies which had not entered into a Pharmacy Agreement with Blue Shield. 440 U.S. at 209, 99 S.Ct. at 1072. Blue Shield argued that scrutiny of the policy was beyond the reach of federal antitrust statutes because the Pharmacy Agreements were part of the "business of insurance" within the meaning of McCarran-Ferguson. Id. at 210, 99 S.Ct. at 1072. The Supreme Court analyzed the history of McCarran-Ferguson and concluded that the exemption provided by the Act was narrow and that it did not apply to the contracts between Blue Shield and the pharmacies. Id. at 231–33, 99 S.Ct. at 1083–84 (applied in *Virginia Academy of Clinical Psychologists,* supra, to the payment of bills of clinical psychologists).

Relevant to the matter at hand is the Court's discussion in *Royal Drug* of Congress' reasoning behind the exemption of the business of insurance from antitrust laws.[3] The Court read the legislative history of the Act to indicate that Congress understood the business of insurance to consist of the underwriting and spreading of risk. 440 U.S. at 220–21, 99 S.Ct. at 1077–78. It contrasted such risk taking with the operation of organizations providing prepaid health care services to their members. The Court concluded that at the time Congress passed McCarran-Ferguson such organizations were not considered to be insurance companies and therefore they were not engaged in the "business of insurance" under the Act. Id. at 225–27, 99 S.Ct. at 1080–81.[4] The case cited approvingly a

3. The decision in *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), prompted Congressional passage of the McCarran-Ferguson Act. In *South-Eastern Underwriters* the Court held that insurers conducting business across state lines were in interstate commerce, and that Congress did not intend to exempt insurance companies from the Sherman Act. Id. at 539, 553, 560, 64 S.Ct. at 1166, 1173, 1177. *South-Eastern Underwriters* overruled *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1869), which had held that issuance of an insurance policy was not a transaction of commerce and thus made insurance regulation the exclusive province of the States. In response to *South-Eastern Underwriters,* Congress considered several measures providing insurance companies with varied exemptions from antitrust laws. *See Royal Drug,* 440 U.S. at 217–20, 99 S.Ct. at 1076–77. One of Congress'

principal concerns was that insurance companies be able to continue joint efforts at risk evaluation under State scrutiny without the interference of federal antitrust laws. Id. at 221, 99 S.Ct. at 1078. The use of the phrase "business of insurance" was an effort to restrict the antitrust exemptions to activities truly within the domain of State insurance regulation. Id. at 220–24, 99 S.Ct. at 1077–79.

4. By the late 1930's, 24 states had adopted enabling acts which brought non-profit hospital service plans under State departments of insurance or, in some instances, under the departments of health or welfare. Nine other states, including Virginia, had ruled that hospital service plans were not insurance companies and were exempt from insurance statutes. *Rorem,* Enabling Legislation for Non-Profit Hospital Service Plans, 6 Law & Contemp.Prob. 528, 531–32 (1939). As discussed later, Virginia has

D.C. Circuit case which had discussed the differences between risk taking insurers and prepaid health care plans.

> Although Group Health's [the prepaid health plan] activities may be considered in one aspect as creating security against loss from illness and accident, more truly they constitute the quantity purchase of well-rounded, continuous medical service by its members. Group Health is in fact and in function a consumer cooperative. The functions of such an organization are not identical with those of insurance or indemnity companies. The latter are concerned primarily, if not exclusively, with risk.... On the other hand, the cooperative is concerned principally with *getting service rendered to its members* and doing so at lower prices made possible by quantity purchasing and economies in operation.

440 U.S. at 228, 99 S.Ct. at 1081, *quoting Jordan v. Group Health Ass'n,* 107 F.2d 239, 247 (D.C.Cir.1939) (emphasis appeared in *Royal Drug* quotation).

Furthermore, the Court in *Royal Drug* noted that some courts have held Blue Cross/Blue Shield organizations not to be insurance companies [5] and, in some circumstances, Blue Cross/Blue Shield has argued that it is not an insurance company.[6] Nevertheless, the Court did not conclude that Blue Shield is never properly considered an insurer and, to the contrary, in a statement applicable to the instant case, the Court said:

> This is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements with participating pharmacies, may not be the "business of insurance" within the meaning of the Act.

440 U.S. at 230, n. 37, 99 S.Ct. at 1082, n. 37.

It is clear from the complaint here that the plaintiff's complaint involves the contracts offered by Blue Shield to its policyholders. While some of the plaintiff's allegations of antitrust illegality may concern the defendants' relations with their members and with insurers and related organizations, the plaintiff's alleged injury concerns only Blue Cross/Blue Shield's relations with policyholders. For the plaintiff, Blue Cross/Blue Shield operates in essentially the same manner as a private insurer. The holder of a Blue Cross/Blue Shield service contract pays a fee to the organizations and can then seek service from a variety of member physicians or hospitals of his own choosing. A principal difference for the policyholder between the defendants and private insurers is that the physician or hospital usually bills the defendants directly rather than having the policyholder seek payment from the insurer. But, for the policyholder of ordinary private insurance who signs the customary assignment of benefits of insurance to a physician or hospital, there is little difference at all except, perhaps, the extent of coverage. For the patient, the Blue Cross/Blue Shield system is different from prepaid benefits organizations such as the health maintenance organization (HMO) in *Group Health.* In that HMO, benefits subscribers received service at the HMO's own facility, or, if necessary, at home. The subscribers have no choice as to what physician they will see, and the physicians work for the HMO. The subscriber, in paying his HMO fee, buys a right to treatment by the organization, not the right to have the organization pay for his treatment. See *Virginia Academy of Clinical Psychologists,* 624 F.2d at 480, which characterizes HMO's as buyer cooperatives but Blue Cross/Blue Shield as agents of physician and hospital members.

Another indication that Blue Cross and Blue Shield are properly considered insurers under certain circumstances is the Virginia

subsequently adopted legislation which provides for State Corporation Commission regulation of service benefit plans under the insurance code and makes certain Virginia insurance laws applicable to such plans. Va.Code §§ 38.1–810 to 834.

5. E.g., *Hospital Service Corp. v. Pennsylvania Insurance Co.,* 101 R.I. 708, 227 A.2d 105, 111 (1967); *Michigan Hospital Service v. Sharpe,* 339 Mich. 357, 63 N.W.2d 638, 641 (1954).

6. *See* Denenberg, The Legal Definition of Insurance, 30 J.Ins. 319, 322 (1963).

statutory scheme for regulating the organizations. While the Virginia Code exempts the defendants from certain laws pertaining to insurers, other insurance laws specifically regulate them. Va.Code § 38.1–818. Laws that are inapplicable to the defendants, for example, include those pertaining to the kinds of insurance companies which may be licensed in the Commonwealth, id. § 38.1–25; special insurance company antitrust laws, id. §§ 38.1–58 to 62, which regulate investment of one insurance company in the stock of another and interlocking directors,[7] and certain of the laws pertaining to organization, admission, and licensing of companies. See, for example, § 38.1–71 (stock companies), § 38.1–74 (mutual companies), and § 38.1–85 (licensing). But, as we mention below, Va.Code § 38.1–813.1 provides for the organization of Blue Cross/Blue Shield.

An abstract of some of the Virginia insurance laws pertaining to the defendants will illustrate the extent of general regulation of Blue Cross/Blue Shield. To begin with, a separate chapter, Chapter 23, of the Code of Virginia (Title 38.1), provides for their mandatory organization and conduct: "Except as otherwise specifically provided by law, no arrangement for furnishing prepaid hospital or medical and surgical or related services or any combination thereof shall be organized, conducted or offered in this Commonwealth other than in the manner set forth in this chapter...." Va.Code § 38.1–813.1. The Virginia regulatory agency is the State Corporation Commission (SCC) and the officer of that body administering the "insurance laws of the State" which apply to the defendants is the "Commissioner of Insurance," § 1. The allocation of the geographic area a Blue Cross/Blue Shield plan may serve is controlled by the SCC and is non-exclusive absent a finding that more than one plan will not promote the public welfare, § 822.-1. The defendants are "placed under the Commission and are subject to the inspection, supervision and regulation of the Com-

mission," § 29. They contribute to the "[e]xpense of administration of insurance laws" of the State "in proportion to their respective gross premium income," § 44. They are subject to the special Unfair Trade Practice laws for the "business of insurance," which are in terms designed to insure compliance with "the intent of Congress" under the McCarran-Ferguson Act, §§ 49 to 57, and, among other things, specifically forbid agreement or concerted action to commit "any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance," (§ 52.4), as well as unfair discrimination between individuals of essentially the same class and hazard (§ 52.7). Their financial condition is subject to corrective SCC orders, the failure to comply with which may result in suspension or revocation of their right "to transact insurance," § 97.2; and they must file with the SCC annual statements of financial conditions as well as other reports, § 159 et seq. We have just recited only a part of the applicable provisions of the insurance laws of Virginia which show that the regulation of the defendants by SCC, if not complete, is pervasive, and the statement of the Code in § 29 that they are "placed under the Commission, and are subject to the inspection, supervision and regulation of the Commission," is a fair statement borne out by an analysis of the statutes, Title 38.1 of the Virginia Code, Insurance.

The case before us is one dealing with the defendants' relations with their subscribers. The idea that they are insurers under certain circumstances is consistent with cases holding that an acknowledged insurance company's activities are not always in the "business of insurance." *SEC v. National Securities, Inc.,* 393 U.S. 453, 459–60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969); *Bartholomew v. Virginia Chiropractors Ass'n,* 612 F.2d 812, 817 (4th Cir.1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64

---

**7.** While service benefit plans such as Blue Cross/Blue Shield are exempt from the special Virginia antitrust laws, as we note below, their ability to compete is limited by SCC allocation of geographic areas. Va.Code § 38.1–822.1.

L.Ed.2d 791 (1980). We thus conclude that *Royal Drug* does not preclude consideration of whether Blue Cross/Blue Shield is in the business of insurance under the instant circumstances.

■ Turning to the question of whether the plaintiff's particular allegations concern the "business of insurance" "regulated under State law", it is readily apparent that the courts, including this one, have often given a narrow interpretation of the term. *See Royal Drug*, supra; *National Securities*, supra; *Virginia Academy of Clinical Psychologists*, supra; cf. *Bartholomew*, supra. Nevertheless, the Supreme Court has noted that the term is not so limited as to preclude coverage of the insurer's relations with its policyholders. The Supreme Court in *National Securities* said:

> Congress [in adopting McCarran-Ferguson] was concerned with the type of state regulation that centers around the contract of insurance.... The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement ___ these were the core of the "business of insurance."
>
> Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was ___ it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

393 U.S. at 460, 89 S.Ct. at 568. Consistently, as mentioned above, the Supreme Court in *Royal Drug* stated that contracts between policyholders and Blue Cross may be within the "business of insurance." 440 U.S. at 230, n. 37, 99 S.Ct. at 1082, n. 37. The allegations in the plaintiff's complaint are the very essence of the relationship between insurer and policyholder. He has alleged that Blue Cross/Blue Shield has re-fused to offer the exact coverage that he prefers.

An incomplete examination of Virginia law with respect to the relationship of the defendants to their subscribers reveals State regulation, including the one immediately at hand.

At the outset, we should say that no significant difference under Virginia law between the treatment of policyholders of private insurers and those of the defendants has been brought to our attention. So far, then, as the Virginia law is concerned, they are essentially the same. We find persuasive the following code sections dealing with relations between the defendants and their subscribers which impose the same conditions on the defendants as are imposed on private insurers, even by the same code sections. Section 38.1–342.1 requires the filing of rate manuals with the SCC "showing rates, rules and classification of risks applicable thereto," and also requires a copy of the form of each policy to be filed which must be "approved in writing by the Commission as conforming to the requirements of this Title [Insurance]" before issuance. § 342.2 prohibits subrogation provisions in policies; § 348.1 prohibits termination of coverage of a dependent incapacitated child upon attainment of a limiting age; § 348.6 requires coverage for newborn children; § 348.7 requires coverage for mental or emotional disorders not more restricted than for any other illness; § 348.8 requires optional coverage for alcoholic and drug dependence; § 348.9 requires optional coverage for obstetrical coverage; § 348.10 prohibits reduction, for other insurance, of benefits under group policies; § 348.11 provides that upon the termination of group insurance because of a person becoming ineligible, a non-group policy must be offered if the insurer offers such a policy; § 354.1 requires the SCC to issue rules and regulations requiring "simplified and readable" policy forms, and, as to policies written after the effective date of the regulation, the SCC must be satisfied before issuance that the policy complies. Thus, as with the general SCC regulation of other aspects of

Blue Cross/Blue Shield, the specific regulation with respect to its relations with policyholders is pervasive.

We thus conclude that the refusal of the defendants to offer the type of policy requested by the plaintiff is in the "business of insurance" and that it is "regulated by State law." 15 U.S.C. § 1012(b).

A finding that particular activities concern the business of insurance regulated by State law does not end the inquiry as to whether the activities are exempt from antitrust laws under the McCarran-Ferguson Act. A court must also find that the activities do not involve "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b).

Plaintiff characterizes the defendants' practices as an illegal tying arrangement involving the tying of one insurance policy to another. At the outset, we should say that it is doubtful that the defendants' declining to issue insurance coverage for plaintiff and son separately from that for plaintiff, wife and son, constitutes the second distinct product necessary for a tying arrangement to exist. See *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953).[8] Assuming, however, that plaintiff has alleged that a tying arrangement exists, we note that two courts considering the exception to McCarran-Ferguson have not found a policy tying arrangement and a risk classification plan, both regulated by State law, to be boycott, coer-

cion or intimidation under the Act. *Dexter v. Equitable Life Assurance Society*, 527 F.2d 233 (2d Cir.1975); *Meicler v. Aetna Casualty & Surety Co.*, 506 F.2d 732 (5th Cir.1975).[9]

Plaintiff, nevertheless, maintains that the defendant's alleged tying arrangement is a "conditional boycott" and thus within the McCarran-Ferguson Act § 3(b), 15 U.S.C. § 1013(b). The Supreme Court's principal discussion of § 3(b) boycotts was in *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). *St. Paul Fire* concerned an alleged conspiracy with three other medical malpractice insurers to refuse to write any malpractice insurance for the customers of St. Paul in order to force those customers to agree to new policy terms St. Paul was imposing. The four companies were the only insurers offering malpractice coverage in the State. Id. at 533, 98 S.Ct. at 2925. The district court dismissed the suit on the grounds that it was barred by McCarran-Ferguson. Id. at 533–34, 98 S.Ct. at 2925–26. The court of appeals reversed the dismissal and the Supreme Court affirmed that decision on the ground that the plaintiff's allegations amounted to a boycott within McCarran-Ferguson § 3(b). Id. at 554, 98 S.Ct. at 2936. The Supreme Court specifically decided that policyholders were included among those protected from boycotts, and rejected the argument that a boycott under § 3(b) was more limited than under antitrust law generally. Id. at 550, 98 S.Ct. at 2934. The Court noted, however, that there had been a lack of uniform-

---

8. In *Times-Picayune,* the Supreme Court considered whether it was a tying arrangement for the owner of two newspapers to require advertisers to purchase space in both newspapers rather than in either newspaper individually. Id. at 596–97, 73 S.Ct. at 874. The Supreme Court held that no tying arrangement existed:
   The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant "tying" product, resulting in economic harm to competition in the "tied" market. Here, however, two newspapers under single ownership at the same place, time, and terms sell indistin-

guishable products to advertisers; no dominant tying product exists . . . .; no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market is the same. Id. at 614, 73 S.Ct. at 883.

9. In *Dexter,* the plaintiff argued that it was an illegal tying arrangement for an insurance company to require the purchase of life insurance as a condition for obtaining a mortgage loan. Id. at 234. The Second Circuit held that the practice was immune from antitrust scrutiny under the McCarran-Ferguson Act.

ity in antitrust law as to the definition of boycott, id. at 543, 98 S.Ct. at 2930, and we observe that the Court's analysis of the decisions on boycotts in the sense presented here is that they involve agreements among several parties. " 'The illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the [target].' " 438 U.S. at 545, 98 S.Ct. at 2931.[10] It emphasized this point in its conclusion by noting, "conduct by individual actors falling short of a concerted refusal to deal is not a 'boycott' within § 3(b)." Id. at 555, 98 S.Ct. at 2936. We have stated the same thing in *Bartholomew,* 612 F.2d at 817.

We think plaintiff has failed to allege the necessary concerted action by the defendants to show an illegal boycott. Plaintiff maintains that the defendants acted in concert with one another and with their respective national organizations. We do not believe such actions constitute an unlawful boycott. As noted earlier, Blue Cross and Blue Shield do not compete, offering instead distinct and complementary coverage. Va.Code §§ 38.1-810, 811. Furthermore, the national Blue Cross and Blue Shield organizations are only trade associations which are not alleged to provide coverage themselves. The decision by each local organization not to offer the coverage desired by the plaintiff is not more than an individual refusal to deal. It is thus not an antitrust violation. *Times-Picayune Publishing Co.,* 345 U.S. at 624–25, 73 S.Ct. at 888–89; see *St. Paul Fire,* 438 U.S. at 555, 98 S.Ct. at 2936. It is also just as important to note that unlike the *St. Paul Fire* plaintiffs, the plaintiff here does not allege that he is unable to purchase his desired insurance coverage, only that he is unable to purchase it from these defendants. See 438 U.S. at 553, 98 S.Ct. at 2935. He is perfectly free to buy his desired coverage elsewhere, and

there is no allegation that the defendants have in any way interfered with that right. We thus conclude that plaintiff failed to allege a boycott under McCarran-Ferguson § 3(b).[11]

Because the activity of the defendants complained of was within the protection of the McCarran-Ferguson Act, the district court properly found that the plaintiff's complaint failed to state a claim upon which relief could be granted, and its judgment is accordingly

AFFIRMED.

---

**10.** Quoting from *Binderup v. Pathe Exchange,* 263 U.S. 291, 312, 44 S.Ct. 96, 100, 68 L.Ed. 308 (1923).

**11.** The plaintiff does not argue coercion or intimidation in his brief.