Jesse G. RAY, t/d/b/a Jesse Ray
Funeral Home, Plaintiff,

v.

UNITED FAMILY LIFE INSURANCE
COMPANY, INC., Defendant.

No. A–75–93.

United States District Court,
W. D. North Carolina,
Asheville Division.

May 2, 1977.

Gwynn G. Radeker and John W. Mason, Redmond, Stevens, Loftin & Currie, Asheville, N. C., J. Nat Hamrick, Hamrick & Hamrick, Rutherfordton, N. C., and Robert B. Long, Jr., Asheville, N. C., for plaintiff.

Harry DuMont and Susan S. Craven, Asheville, N. C., Byrum, Byrum & Burris, Robert N. Burris, Charlotte, N. C., George H. Myshrall, Jr., Heyman & Sizemore, Atlanta, Ga., for defendant.

## ORDER

McMILLAN, District Judge.

Jesse Ray, plaintiff, alleges in his complaint that the defendant, United Family Life Insurance Company, Inc., violated North Carolina General Statutes § 75–1.1, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by attempting to monopolize the burial insurance business in North Carolina and by terminating Ray as agent for defendant on June 24, 1972, because Ray declined to stop selling burial insurance for companies other than United Family.

The defendant moved for dismissal and for summary judgment on all claims, contending that no material issue of fact is in dispute. Defendant has submitted a number of affidavits and documents in support of its motion. In response to the motion, plaintiff relies on two affidavits in addition to his verified complaint.

Plaintiff's evidence would permit finding facts as follows:

Jesse Ray operates a funeral home in Asheville, North Carolina. In connection with that business, Ray has, since the early 1950's, sold what is commonly called "burial insurance" or "funeral insurance." Such insurance is sold in the form of life insurance with the expectation that the proceeds will be used to pay the funeral expenses of the insured.

The sale of burial insurance grew out of the practice of funeral homes during the '40's and '50's to organize local citizens into burial associations, whose income would be used to pay the funeral expenses of members upon their death. North Caro-

lina law limited burial associations' allowable benefit to $200 or less, and when funeral expenses began to exceed $200, private insurance companies started selling supplemental burial insurance through funeral homes in connection with the burial associations of such homes.

In the typical situation, and in Jesse Ray's situation, burial insurance is sold by an employee of the funeral home (often the owner or a funeral director) who works as an agent of the insurance company. The agent goes door-to-door and sells the insurance, indicating to the customer that it is being provided as a service of the funeral home. The policy amounts are usually small, between $250 and $1,500. The agent collects the premiums monthly from the policyholders or asks the policyholders to mail premiums to the agent's funeral home.

Agents are paid a salary. The funeral home receives a renewal commission, but the commission is not sufficient to meet the overhead expenses incurred. Instead, the funeral home reaps its reward in the form of funeral business. In the vast majority of cases, the insured's funeral is serviced by the funeral home that sold the burial insurance. Beneficiaries are not required to use the proceeds for funeral expenses of the insured, but as a practical matter they usually do. Thus the sale of a burial insurance policy, absent a lapse in premium payments, is tantamount to a deferred sale of a funeral.

Burial insurance is sold in the form of life insurance. A burial insurance policy is easily distinguished from a regular life insurance policy, however, because of the generally low policy amounts, the monthly rather than quarterly premiums, the manner of sale and collection of premiums, and the express representations of the agent-salesman to the customer.

United Family, the defendant, recognizes the distinction between the two types of insurance in its corporate organization by having a separate division the sole responsibility of which is burial insurance.

From 1963 or 1964 until 1967, Jesse Ray sold burial insurance for Consolidated Life Insurance, a company in which he owned stock. United Family, the defendant, purchased Consolidated Life in 1967. United Family also acquired Allied Security Life Insurance Company, another burial insurance company, about that time.

From 1967 until 1972, Jesse Ray worked as an agent for United Family, in the manner previously described.

At a meeting with a United Family officer on June 22, 1972, Ray was told that he would have to discontinue his agency agreement with Northwestern Security Life, a competitor of United Family, or risk termination of his relationship with United Family. Ray declined and by letter of June 24, 1972, was terminated as an agent of United Family. As a result, Ray lost renewal commissions on policies he had previously sold and the deferred funeral business the policies generated. Documents offered by plaintiff tend to show that United Family diverted some of Ray's former insurance clients to competing funeral homes in Asheville two years after Ray was terminated.

Ray submitted the affidavit of Robert L. Smith, who was Administrative Vice President of United Family from 1968 until 1969. Mr. Smith states that it was the intent of United Family to exclude competition completely in the burial insurance industry in North Carolina by (1) acquiring burial insurance divisions of other companies, (2) taking agents away from other burial insurance companies, and (3) threatening to terminate and, in fact, terminating agency agreements with funeral homes which did not abide by certain restrictions such as dealing exclusively with the defendant.

Smith's affidavit also supplies statistics which show that United Family has come to dominate the market for burial insurance in North Carolina. According to Smith, United Family, in 1975, collected over $6,000,000 in premiums on policies sold through funeral homes as burial insurance. During the same period, United Family's two principal competitors, Northwestern Securities and Coastal Plains insurance companies, together collected only $1,750,000 in premiums in that market.

As further evidence of United Family's substantial market share, Smith states that 300 or more funeral homes are currently selling and servicing its burial insurance policies, compared to the 35 to 50 homes dealing with Northwestern Securities. Coastal Plains has fewer funeral home agencies than Northwestern.

If the above facts are correct, which for these purposes I find them to be, United Family enjoys a commanding share of the market for burial insurance in North Carolina.

## THE NORTH CAROLINA STATUTES

■ North Carolina General Statutes § 75–1.1 provides in relevant part:

"§ 75–1.1 Methods of competition, acts and practices regulated; legislative policy.—(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

. . . . .

"(d) Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim. (1969, c. 833.)"

Persons injured by violations of this section are entitled to treble damages. G.S. § 75–16.

United Family contends that plaintiff cannot recover damages under § 75–1.1 because unfair methods of competition perpetrated by persons engaged in the business of insurance are regulated exclusively by the insurance statutes, G.S. §§ 58–54.1 et. seq., which do not provide for civil damage actions.

Under G.S. §§ 58–54.1 et seq., the Commissioner of Insurance is charged with determining whether persons engaged in the business of insurance have employed unfair methods of competition or unfair or deceptive trade practices as defined in those sections, and is authorized to enforce such determinations through cease and desist orders.

The defendant's argument is based on the language of the Declaration of Purpose of the Insurance Article found in G.S. § 58–54.1 which states:

"§ 58–54.1 Declaration of purpose.— The purpose of this Article is to regulate trade practices in *the business of insurance* in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress), *by defining, or providing for the determination of, all such practices* in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined. (1949, c. 1112.)" (Emphasis supplied.)

Section 75–1.1(d) places the burden on defendant to show that the business of insurance is exempted from § 75–1.1 by the Declaration in § 58–54.1 that the determination of "all such practices" is provided by §§ 58–54.1 *et seq.*

The very language of the Declaration of Purpose itself reveals that the intent of §§ 58–54.1 *et seq.* is to oust *federal* antitrust regulation of the business of insurance in North Carolina, *not* to exempt that business from other *North Carolina* regulations.

The State was availing itself of the Act of Congress of March 9, 1945 (15 U.S.C. § 1012(b)) which makes the federal antitrust laws applicable to the business of insurance to the extent that such business is not regulated by State law. The purpose of G.S. §§ 58–54.1 *et seq.* is to define or provide for the determination of "all such practices" in order to oust federal antitrust jurisdiction as completely as 15 U.S.C. § 1012(b) allows; the purpose is not to make those sections the exclusive *North Carolina* remedy for unfair trade practices in the insurance industry.

G.S. § 58–54.12 recognizes this limited purpose by expressly providing that "The powers vested in the Commissioner by this Article shall be *additional to* any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts and practices herein declared to be unfair or, deceptive." Section 75–16

empowers private parties like plaintiff Ray to enforce a treble damage penalty for unfair trade practices.

Defendant has failed to meet its burden of showing its exemption from § 75–1.1.

### EXEMPTION FROM THE SHERMAN ACT

 United Family further relies on N.C.G.S. §§ 58–54.1 *et seq.* for its contention that the acts complained of here are not subject to the Sherman Act in view of the comprehensive regulation of unfair trade practices in the business of insurance in North Carolina.

As noted above, 15 U.S.C. § 1012(b), best known as the McCarran-Ferguson Act, states in pertinent part that "the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law." Section 1013(b) further provides that

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

Thus, to preclude scrutiny under the Sherman Act, the acts complained of here must, first, be within the "business of insurance," and, second, not involve any act of "boycott, coercion, or intimidation." Refusals to deal with agents in furtherance of an attempt to monopolize flunk both criteria.

The fact that Sherman Act violations are committed by insurance companies does not render those violations exempt from federal regulation. Rather, the anti-competitive acts must be within "the business of insurance" as that phrase is used in § 1012(b). The Supreme Court made the point very clearly in *SEC v. National Securities, Inc.*, 393 U.S. 453, 459–460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969):

". . . The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *busi-ness* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* [*United States v. South-Eastern Underwriters, Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440] was all about. The selling and advertising of policies, *FTC v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. *Robertson v. California*, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* [75 U.S. (8 Wall.) 168, 19 L.Ed. 357] held was not 'commerce.' The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on *the relationship between the insurance company and the policyholder.* Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.' " (Emphasis added.)

Jesse Ray's suit against United Family involves the relationship of *agent* and company, not the relationship of *policyholder* and company. Refusal to deal with an *agent* does not fall into any of the categories listed in the *National Securities* case. The background and legislative history of the McCarran-Ferguson Act, as discussed in *National Securities*, gives no indication that Congress intended insurance agents to be treated differently than any other kind of agent in relation to their companies.

This view is supported by the opinion in *American Family Life Assurance Co. v. Planned Marketing Associates, Inc.*, 389 F.Supp. 1141 (E.D.Va.1974), where the court held that attempts by the defendant to induce plaintiff's agents to cease dealing in plaintiff's insurance did not involve the "business of insurance" within the meaning of 15 U.S.C. § 1012(b).

Furthermore, defendant's threat to Ray that it would cut off Ray's agency and thereby deprive him of renewal commissions and deferred funeral business constituted "coercion" as that term is used in § 1013(b).

United Family's contention that Ray was not covered by United Family's threat because he was not utterly dependent on United Family's agency for his financial livelihood is without merit. The defendant was attempting to alter Ray's business practices with an economic club. The legality of using that club is not measured by the victim's wealth or lack of it.

## SHERMAN ACT § 1

■ The burden of a claim under Section 1 of the Sherman Act is a "contract, combination, or conspiracy" in restraint of trade. Plaintiff has failed to allege any facts to show that his agency was terminated as a result of a conspiracy. The only allegation of a conspiracy is one between the officers and directors of United Family. Section 1 was not intended to reach such an internal conspiracy. Officers and directors of a single business entity are not expected to compete with each other. Thus, a conspiracy among them does not ordinarily present the anti-competitive problems the Sherman Act was intended to proscribe.

At the hearing of this motion, plaintiff contended that United Family conspired with another Asheville funeral home to injure Ray's competitive standing in the burial insurance market. Ray relied on United Family's decision, two years after Ray's termination, to give some of Ray's former clients to the Asheville competitor. Plaintiff conceded, however, that there was no evidence of any conspiracy between United

Family and Ray's competitor *before* United Family terminated Ray's agency.

The act of United Family in terminating Jesse Ray's agency agreement thus was an act by a single business unit and not an act in furtherance of any conspiracy.

## SHERMAN ACT § 2

■ Section 2 of the Sherman Act outlaws monopolization and attempts to monopolize. Courts have not always agreed on the elements of an attempt to monopolize. One or more decisions have required the plaintiff to show a specific intent on the part of the defendant to monopolize, *e. g. Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1964), or both a specific intent to monopolize *and* a dangerous probability of success, *e. g. E. J. Delaney Corp. v. Bonnie Bell, Inc.*, 525 F.2d 296 (10th Cir. 1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976).

Although proof of the defendant's market power may be an alternative to direct evidence of *intent* to monopolize, it is not necessarily an *element* of an attempt to monopolize. A showing of anti-competitive acts accompanied by a specific intent to monopolize should be sufficient to make out a case of attempt. See P. Areeda, *Antitrust Analysis*, 241–249, 258 (2nd Ed. 1974).

Plaintiff has made this showing. United Family coerced Ray by demanding exclusive dealings and firing him when he refused. No social or business excuse for such exclusivity is shown. United Family is not a weakling in the field, nor a newcomer, and does not need exclusive agents to survive; indeed, it makes a practice of absorbing other companies. Robert Smith's affidavit clearly shows that the refusal to deal with plaintiff was accompanied by a specific intent to monopolize. The evidence amply shows attempt to monopolize.

In addition, plaintiff's evidence shows that burial insurance is a submarket of life insurance, and is the relevant market here, and that United Family has a commanding share of that market. In *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502,

8 L.Ed.2d 510 (1962), the Supreme Court held that within broad markets, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1524.

Here, United Family recognizes a distinct submarket in its own corporate organization; consumers and agents alike understand burial insurance to be just that; specialized vendors (funeral homes) sell the insurance; policy amounts and premium collections differ greatly from regular life insurance; and the proceeds are almost always used for a single purpose—to pay for the funeral of the insured.

Burial insurance is thus not merely a gimmick for selling more life insurance, as defendant argues, but is the result of a well-defined consumer need which had been supplied by burial associations until increased funeral costs prompted insurance companies to enter the market. Funeral homes have no reason to sell life insurance as such; they sell burial insurance to obtain and get paid for funeral business. The monopolization of burial insurance would seriously affect the distribution of resources devoted to funerals in ways that a freely functioning life insurance market could not prevent. The producers and consumers in the burial insurance market are entitled to antitrust protection from attempts to monopolize that market.

Plaintiff has submitted evidence that United Family collects three times as much in yearly premiums as its two principal competitors in the burial insurance market. United Family's string of funeral home agents, as compared with those who sell competitors' policies, confirms its power in the relevant market.

Taking plaintiff's evidence as true, United Family is dangerously close to a monopoly of a relevant market for burial insurance; United Family intends to accomplish monopolization of that market; United Family terminated Ray's agency, in furtherance of that intent, because he refused to stop dealing with a United Family competitor.

IT IS THEREFORE ORDERED:

1. That the defendant's motion for summary judgment on the North Carolina General Statutes § 75-1.1 claim is denied.

2. That the defendant's motion for summary judgment on the Sherman Act § 1 claim is granted.

3. That the defendant's motion for summary judgment on the Sherman Act § 2 claim is denied.