Lacy THOMPSON, Plaintiff-Appellant,

v.

NEW YORK LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 80–7458.

United States Court of Appeals, Fifth Circuit. Unit B

May 4, 1981.

Wright Gellerstedt, Decatur, Ga., for plaintiff-appellant.

Carter, Ansley, Smith & McLendon, H. Sanders Carter, Jr., Malcolm C. McArthur, Atlanta, Ga., for defendant-appellee.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

FAY, Circuit Judge:

Appellant, a former insurance agent, appeals the District Court's grant of summary judgment in favor of the appellee, appellant's former employer New York Life Insurance Company, on his anti-trust action against certain employment restrictions in appellant's agency contract. Appellant also challenges the District Court's grant of appellee's first motion to amend its counterclaim for recovery of money owed on account. We affirm both decisions of the trial court.

---

* District Judge of the Northern District of Alabama sitting by designation.

## I.

Appellant entered into a Soliciting Agents Contract with New York Life Insurance Company on March 22, 1957. This form contract authorized appellant, as a field underwriter, to solicit insurance applications subject to approval by appellee and to collect the initial premiums. The agreement specified that the appellant was an independent contractor, free to exercise his own discretion and judgment as to the time, place, manner and to whom his solicitations were made.

Appellee also offers a separate contract known as "Nylic", on an optional basis, which provides additional incentive benefits beyond the commissions earned under the Soliciting Agents Contract [1] to those qualified agents who apply and are approved. Appellant's application under this separate contract was approved on March 6, 1958. To qualify for continued Nylic membership the agent must comply with a number of conditions. The conditions pertinent to this appeal are:

(a) The agent "must operate, continuously during the Contract Year, under the Company's agency contract form . . .";

(b) The agent "must not engage in any other business or occupation for remuneration or profit during the Contract Year without the written consent of the Company";

(c) The agent "must not represent any other insurance company nor place any application for life or any other type of insurance or annuity with any other insurer during the Contract Year without the written consent of the Company";

(d) The agent "must procure under his agency contract within the Contract Year, applications upon which policies or lives other than his own are effected with the Company for not less than the total amount of fifty thousand dollars ($50,000.00) of new insurance. . . ."

Appellant fulfilled all of the Nylic conditions from 1958 until 1972 when he constructed a large motel/restaurant complex in Atlanta without appellee's permission. Beginning in 1974, as a result of an economic recession, appellant devoted a substantial portion of his time to the management of this personal business interest. This allocation of his time resulted in his failing to procure policy applications upon new insurance in an amount exceeding $50,000.00. Based upon this lack of production and the discovery of appellant's unauthorized outside employment, appellee terminated appellant's Soliciting Agent's Contract and Nylic membership on November 12, 1976.

In his complaint, appellant alleged that the Nylic restriction regarding outside employment constituted a per se violation of section 1 of the Sherman Act, since it prohibited the acceptance of more competitive offers for the purchase of his entrepreneurial services. In response the appellee contended that the agency contract and its provisions were exempt from anti-trust scrutiny by virtue of it constituting the "business of insurance" under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1013 (1976). Both parties sought summary judgment on this issue.

Appellee further asserted a counterclaim for $16,311.36 allegedly paid to appellant as commissions on insurance policies which were later cancelled. The obligation to repay was set out in section 13(a)iii of the Field Underwriter's Handbook which was

---

1. Nylic payments are made on a monthly basis in addition to commission received. They are computed according to a formula which takes into account the amount of insurance sold which has remained in force a specified number of years. Payments can be substantial, for example, freshmen Nylics, three to five years continuous membership, receive $0.40 per thousand of amount on qualifying paid-for insurance. First degree Nylics, six to ten years continuous membership, receive $0.60 per thousand. Second degree Nylics, eleven to fifteen years continuous membership, receive $0.80 per thousand. Third degree Nylics, sixteen to twenty years continuous membership, receive $1.00 per thousand. After twenty consecutive membership years, the Nylic member is entitled to additional compensation which takes into consideration his sales history through the twentieth year. Thereafter, Nylic membership is terminable only if the member dies or enters the service of another life insurance company. *Record* at 30–33.

incorporated by reference as part of the agency contract. It provides:

If, for any reason, the Company rescinds or cancels a policy and refunds or tenders a refund of a premium, in whole or in part, the field underwriter, upon demand therefor, shall repay the Company the amount of any commission received by him thereon; . . .

Appellant responded to this by alleging that appellee had never made a tender of premium as required and, therefore, moved for summary judgment on the counterclaim. However, the trial court found that appellant had failed to establish by use of affidavit or otherwise, that tender was not made so the trial court declined to issue summary judgment. At this point in the proceedings appellee filed its first motion to amend the counterclaim. The new counterclaim alleged that $10,045.19 was due for duplicate commissions paid to appellant in error, and that further sums were due and owing for F.I.C.A. taxes paid by appellee in appellant's behalf and for various personal insurance premiums charged to appellant's account. Appellant opposed this motion to amend on grounds of jurisdictional amount and, at least on appeal, good faith. The trial court granted appellee's motion to amend and subsequently, after discovery, granted summary judgment in favor of appellee in the amount of $15,342.47.

## II.

The principal issue joined on appeal is whether the challenged provisions of appellant's Nylic agency contract are exempt from anti-trust liability as being the "business of insurance" under the provisions of the McCarran-Ferguson Act. This Act states, in pertinent part:

Section 2

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012 (1976).

The Act was passed in reaction to the Supreme Court's decision in *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) prior to which it had been assumed that issuing a policy of insurance was not a transaction in interstate commerce. *See Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). The most frequently cited statement of the effect of this statute was made by Justice Marshall in *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

"The statute did not purport to make the states supreme in regulating all the activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the business of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, *cf. Robertson v. California,* 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insur-

ance, the transaction which *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

*Id.* at 460, 89 S.Ct. at 568.

▬ The trial court correctly recognized that the proper focus of its inquiry should be upon the impact of the challenged activity or restriction on the insurer/insured relationship. The trial court concluded, without lengthy analysis, that at the center of this relationship was the agent, a middleman in the truest sense, and that, therefore, the terms and conditions of the agency contract were, a *fortiori*, within the business of insurance. *Thompson v. New York Life Insurance Co.,* No. 78–1149(A), at 3 (N.D.Ga. Feb. 26, 1979). Although correct in result such a broad brush approach to the issue implies more than is warranted.

The Supreme Court in *Group Life and Health Insurance Company v. Royal Drug Company,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) has indicated, in the context of interindustry third-party provider agreements, that there is a distinction to be drawn between activities which are the business of insurance companies, or are sound business practices and those which are the business of insurance. *See Saint Bernard Hospital v. Hospital Service Association, Inc.,* 618 F.2d 1140, 1144 (5th Cir. 1980). In essence the Court in *Royal Drug* held that contractual arrangements between participating pharmacies to provide drugs to Blue-Shield of Texas policyholders

at a set low price were agreements outside of section 2(b)'s exemption despite the cost-savings the agreements provided to the insurer and thus to the insureds. In comparison appellant argues that Nylic condition (b) is even less concerned with the insurer/insured relationship and further that it involves a larger number of parties outside the insurance industry, i. e. all potential purchasers of appellant's entrepreneurial services. However, *Royal Drug* provides little support for appellant here. It is clear that the Supreme Court did not address the issue before us, the validity of agency restrictions, and has left open the exact parameters of "transactions between an insurer and its agents, including independent agents." 440 U.S. at 224, n.32, 99 S.Ct. at 1080, n. 32. Therefore, we must analyze the issue as one of first impression, keeping in mind though, the restrictive spirit of *Royal Drug*.

We find, upon turning to decisions of sister courts, that exclusive agency clauses have been deemed exempt from anti-trust scrutiny as part of the business of insurance. *Black v. Nationwide Mutual Insurance Company,* 429 F.Supp. 458, 463 (W.D. Pa.1977) *aff'd* 571 F.2d 571 (3rd Cir. 1978); *Steinberg v. Guardian Life Insurance Co. of America,* 486 F.Supp. 122, 124 (E.D.Pa. 1980). *But see Ray v. United Family Life Insurance Co., Inc.,* 430 F.Supp. 1353 (W.D. N.C.1977). Most other decisions have focused more on whether the challenged agency contract provisions, and the various enforcement activities of the insurer, constitute a boycott under section 3(b) of the Act [2] rather than whether such activity is the business of insurance. *See Card v. National Life Insurance Company,* 603 F.2d 828 (10th Cir. 1979); *Blackley v. Farmers Insurance Group,* 1976–2 Trade Cases (CCH) ¶ 61,061 (D.Utah 1976). Indeed, this Court has treated similar allegations, although not specifically based on contractual

---

**2.** Section 3(b), which is basically an exception to the exemption of section 2(a), reads as follows:

Nothing contained in this chapter shall render the said Sherman Act inapplicable to any

agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation. 15 U.S.C. § 1013 (1976).

conditions, as activity within the business of insurance. *Blackburn v. Crum & Forster*, 611 F.2d 102, 104 (5th Cir. 1980), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1981). But the challenged condition before us is not merely a restriction upon servicing a competitor in the insurance business. It prohibits the appellant from engaging in "any other business or occupation for remuneration or profit."

■ Clearly not all provisions that could be placed in an agency contract, nor all dealings between insurance companies and their agents are exempted by the McCarran-Ferguson Act.[3] In *Zelson v. Phoenix Mutual Life Insurance Company*, 549 F.2d 62 (8th Cir. 1977) the Eighth Circuit held that an insurance company practice requiring all agents to provide securities services in a particular manner, in order to continue selling and servicing its insurance policies, was not the business of insurance. 549 F.2d at 69 and n.12. An important factor for the Court was whether "the participation of the agent in the alleged scheme concerned the agent's insurance dealings as such" since this is a strong indication that the scheme has a bearing on the core relationship between insurer and insured. *Id.* We find this inquiry particularly relevant to the situation before us.

■ Appellee's restrictions did not force appellant to engage in activities unrelated to insurance. Instead this optional contract offered appellant various incentives, beyond the usual agency relationship, so that appellant would agree to focus all his entrepreneurial skills solely on selling insurance. This distinction is significant and on the facts of this situation dispositive. Such activity, whatever its merit, is within the business of insurance. Whether restrictive covenants is a good policy is not a decision for this Court to make. We are merely required to determine if the challenged activity is the business of insurance. Congress has determined that the states are the proper regulators of this business activity and it is not for this Court to go beyond that decision. We therefore, affirm the District Court's grant of summary judgment for the appellee.

### III.

■ Appellant's arguments that the trial court abused its discretion by granting appellee's first motion to amend its counterclaim are unpersuasive. The policy behind Fed.R.Civ.P. 15(a) is to freely allow amendments unless the rights of the adverse party would be unduly prejudiced. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *See also Hall v. National Supply Company*, 270 F.2d 379, 383 (5th Cir. 1959). This policy is certainly strongest where the motion challenged is the first motion to amend. We cannot say that appellee's conduct in amending its factual allegations so clearly indicated bad faith on their part as to justify the conclusion that the District Court abused its discretion in granting appellee's motion. Therefore, the decisions of the trial court appealed from are AFFIRMED.

**3.** *Compare Commander Leasing Co. v. Transamerica Title Ins. Co.*, 477 F.2d 77 (10th Cir. 1973) (alleged conspiracy between insurance company and agents to fix prices of title insurance held exempt) *and Seidner v. Union Cent. Life Ins. Co.*, 1973–1 Trade Cases (CCH) ¶ 74,561 (N.D.Ill.1973) (conspiracy to restrain agent's ability to participate in interstate insurance trade held exempt) *with American Fam. Life Assur. Co. v. Planned Mkt. Assoc.*, 389 F.Supp. 1141 (E.D.Va.1974) (conspiracy to induce insurance agents to switch principals not exempt) *and Allied Fin. Serv. Inc. v. Foremost Ins. Co.*, 418 F.Supp. 157 (D.Neb.1976) (pirating of agent's sub-agents by insurance company not exempt).