**STATE OF MARYLAND**

v.

**BLUE CROSS AND BLUE SHIELD ASSOCIATION, Blue Cross of Maryland, Inc., Blue Shield of Maryland, Inc., Group Hospitalization, Inc., and Medical Service of the District of Columbia, Inc.**

**Civ. No. HM84–3839.**

United States District Court,
D. Maryland.

Sept. 16, 1985.

Stephen H. Sachs, Atty. Gen., Baltimore, Md., Charles O. Monk, II, Deputy Atty. Gen., Michael F. Brockmeyer, Asst. Atty. Gen. and Chief of Antitrust Div., Kathleen Kunzer, Asst. Atty. Gen., for plaintiff.

James W. Rankin, Sydney Bosworth McDole, Kirkland & Ellis, Marvin C. Reiter, Mary Ader, Chicago, Ill., Wilbur D. Preston, Jr., Nevett Steele, Jr., Gerson B. Mehl-

man and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., for Blue Cross & Blue Shield Assn.

Joshua F. Greenberg and Kaye, Scholer, Fierman, Hays & Handler, New York City, Peter H. Gunst, Deborah L. Robinson and Frank, Bernstein, Conaway & Goldman, Allen L. Schwait and Garbis & Schwait, F.M. Gloth, Jr., Baltimore, Md., for Blue Cross of Md., Inc.

Charles J. Steele, Jacqueline M. Saue, Thomas F. Fitzgerald, Stephen J. Savage, and Pierson, Ball & Dowd, Washington, D.C., for Group Hospitalization, Inc. and Medical Service of the Dist. of Columbia.

William M. Hesson, Jr., Stephen J. Nolan, Robert S. Glushakow & Nolan, Plumhoff & Williams, Peter H. Gunst, Deborah L. Robinson and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for Blue Shield of Md., Inc.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

In the instant action the State of Maryland has sued several defendants for alleged violations of the Sherman Act, 15 U.S.C. § 1, and similar state antitrust statutes, Md.Comm.Law Code Ann. § 11-204(a)(1) (1983). The complaint names five defendants but because of mergers between four of the defendants, only three entities are presently before the court. They are: 1) Blue Cross and Blue Shield Association ("BCBSA"), a national trade association which owns and licenses the rights to the Blue Cross and Blue Shield trade names; 2) Blue Cross and Blue Shield of Maryland, Inc. ("BCBSM"), an insurance provider licensed to do business in Maryland which is the successor in interest to Blue Cross of Maryland, Inc. and Blue Shield of Maryland, Inc.; and 3) Group Hospitalization and Medical Services, Inc. ("GHI"), another insurance provider licensed to do business in Maryland which is the successor in interest to Group Hospitalization, Inc. and Medical Service of the District of Columbia, Inc. BCBSM and GHI are members of defendant BCBSA.

Collectively, the court will refer to the defendants as the "Blues."

The State has filed a motion for partial summary judgment and the defendants have each filed motions to dismiss addressing the same issue; to wit, whether the defendants may assert the McCarran Ferguson Act exemption as a complete defense to the federal antitrust claims. The court held a hearing on these motions on Friday, February 1, 1985 and is now prepared to rule.

*Factual Background*

The complaint asserts that, beginning in 1954 and continuing to the present, the Blues have violated section 1 of the Sherman Act by allocating contracts, customers and markets, by refraining from competition, by submitting noncompetitive and collusive bids to the State, and by fixing prices. Specifically, the State believes that the licensing agreements between BCBSA and the local Blues impermissibly allocate the insurance market in Maryland. The State alleges that GHI has agreed with BCBSA to operate in the Prince George's County and Montgomery County suburbs of Washington, D.C. while BCBSM has agreed to operate in the remainder of the state. The State further alleges that BCBSM has submitted collusive bids in response to the State's Requests for Proposals ("RFPs") for insurance for state employees, their dependents, and retirees and that GHI has refrained from submitting bids for the state contract in accordance with the impermissible territorial allocation agreements.

In their filings to date, the defendants have admitted the existence of the territorial allocation agreements. They submit, however, that these agreements are exempt from federal antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Accordingly, they have filed motions to dismiss the federal and pendent state claims pursuant to Federal Rule of Civil Procedure 12. Conversely, the State seeks to strike the McCarran Ferguson defense in a motion for partial summary judgment pursuant to Rule 56.

## 910

*Procedural Posture of the Various Motions*

Although all parties agreed that the McCarran Ferguson Act issue should be resolved expeditiously, there was some disagreement over the proper procedural vehicle. At the hearing, the defendants argued that their motions to dismiss were appropriate while the state submitted that a partial summary judgment motion would be preferable because it would avoid the necessity of the court considering this issue more than twice (e.g. in connection with the instant motion and at trial). Defendant BCBSA objected to the partial summary judgment motion because it believes that motion is not a proper way to challenge an affirmative defense.

There is a split in authority over the propriety of a partial summary judgment motion aimed at precluding the use of an affirmative defense. *Compare Bernstein v. Universal Pictures, Inc.*, 379 F.Supp. 933, 936 (S.D.N.Y.1974) *with O'Donnell v. Georgia Osteopathic Hospital, Inc.*, 574 F.Supp. 214, 216 n. 1 (N.D.Ga.1982). When faced with this type of offensive summary judgment motion, some courts have treated it as a motion to strike pursuant to Rule 12(f). *See e.g. Washam v. J.C. Penney Co.*, 519 F.Supp. 554, 557 (D.Del.1981). This court did not have that option because defendant BCBSA has not filed its answer. The other option open to the court is the conversion of defendants' 12(b)(6) and 12(c) motions into partial summary judgment motions. In exercising this option the court must afford all parties "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." F.R.Civ.P. 12(b)(6); 12(c).

At the hearing, the court determined to exercise the conversion option, thereby creating cross motions for partial summary judgment. It directed the defendants to file any additional memoranda and exhibits pertinent to the motions within sixty (60) days. Plaintiff was to file its additional submissions thirty (30) days thereafter.

BCBSA filed a timely memorandum on April 2, 1985. Paper # 34. Thereafter, BCBSM adopted BCBSA's memorandum. Paper # 36. Later in April BCBSM and GHI filed affidavits of two of their actuaries, Raymond Biondi, Jr. and Robert Huber. Papers # 37, 38. After receiving an extension of time, the state filed its supplemental memorandum together with attachments A–R on May 10, 1985. Paper # 40. Neither party filed any documents with the court during the remainder of May and most of June. In late June and early July, all defendants filed motions requesting permission to file responses to the state's memorandum and attachments. Included with those motions were the proposed responses. Papers # 41–43. In addition, BCBSA moved to strike the affidavit of Neil Vance. Paper # 40, Att. A. The state filed a memorandum opposing both the filing of responses by the defendants and the motion to strike. Paper # 45.

In an exercise of its discretion, the court has determined to permit all of the supplemental filings. In addition, the court will deny the motion to strike Mr. Vance's affidavit. Defendants object to Mr. Vance's testimony because they contend his identity was not disclosed to them in a timely manner. The court does not believe the record substantiates that claim. The defendants also object because plaintiff has not permitted them to depose Mr. Vance. The discovery rules do not require that a party make his expert available for deposition.

*Exhibits*

a. Affidavits

All parties have submitted affidavits in support of their respective positions. The defendants' first affidavits are from their actuaries. BCBSM offered the affidavit of Raymond Biondi, Jr., its director of actuarial research and rating. In his affidavit, Mr. Biondi states that BCBSM considers the geographic locations of the employment groups it insures in determining appropriate rate levels. He asserts that individuals employed in the District of Columbia metropolitan area are more likely to utilize

expensive health facilities and will be charged higher physicians' rates than individuals working in other parts of Maryland. Paper # 37 at ¶ 4. He notes that BCBSM does not have sufficient familiarity with the health care costs charged in the D.C. metropolitan area which is currently part of GHI's territory in order to set appropriate rates. He speculates that if BCBSM were to market in the GHI area, it would have to charge higher rates. *Id.* at ¶¶ 6–7.

GHI presented the affidavit of its vice president for actuarial services, Robert J. Huber. Mr. Huber states that, in his experience, provider charges and patient utilization vary among geographic areas. Paper # 38 at ¶ 5. Provider charges and utilization rates determine insurance rates.

BCBSA also offered the affidavit of its chief actuary, James K. Hutchison. Mr. Hutchison first describes the actuarial and underwriting functions. He then asserts that the Blue Cross plans' geographic limits enable them to excel in ratemaking. He states the geographic limits allow the plans to develop intimate familiarity with the utilization patterns of their own communities and the provider charges common in those communities. Paper # 34, Ex. A at ¶¶ 8–9.

In response to these affidavits, the State has offered the testimony of Neil Vance, an assistant professor of actuarial science at the Wharton School's insurance department. The State tendered Mr. Vance as an expert on the issue of whether a particular practice is related to the transfer or pooling of risk or to a non-insurance function. Paper # 40, Att. A at ¶ 9. Mr. Vance reviewed discovery materials including internal memoranda from defendants BCBSM's and GHI's files prior to forming his opinions. Mr. Vance states that there have been incursions by both plans into areas across the boundary and that these incursions demonstrate the plans saw no underwriting or ratemaking barrier to marketing in each other's areas. He further states that the boundary is unrelated to insurance and is the result of a marketing decision not to compete for customers. *Id.* at ¶¶ 13,

15. Mr. Vance also comments upon the defendants' various arguments. *Id.* at ¶ 16. Finally, Mr. Vance notes that the two plans also observe their boundary with respect to administrative services only ("ASO") contracts. An ASO contract is used where a group is self insured. Through the ASO contract, claims are administered and paid by the insurance company and the group reimburses the insurance company for all claims paid plus administrative expenses. Mr. Vance asserts that ASO contracts do not constitute the business of insurance because the insurance company assumes no risk. He believes observance of the boundary with respect to ASO contracts cannot be related to the underwriting or transferring of risk. *Id.* at ¶ 33.

Disturbed by Mr. Vance's conclusions, the defendants have offered the affidavit of C. Rufus Rorem. Mr. Rorem has been associated with the Blue Cross system since its inception. He is presently retired. Mr. Rorem testifies that the practice of restricting Member Plans to exclusive service areas was adopted by the Blue Cross Commission at least forty-five years ago. Paper # 48, ¶¶ 13–14. This practice, for example, is reflected in the 1939 Approval Standards of the Commission. *Id.* ¶ 14. Dr. Rorem states that exclusive service areas were imposed on the Plans by the Commission as a condition for approval of the right to use the Blue Cross name. *Id.* ¶¶ 12–13. In deciding that Member Plans should operate within exclusive service areas, Dr. Rorem believes the Commission was not motivated by any illicit anticompetitive objectives. *Id.* ¶ 16. Rather, the Commission found that the service areas were instrumental in achieving the objectives of establishing and maintaining effective, low-cost, nonprofit, prepaid health plans that served all sectors of the community. *Id.* ¶¶ 16–22.

Specifically, Dr. Rorem recalls that the following considerations influenced the Commission's decision to require the Plans to operate in exclusive service areas: (1) experience with Plans operating in nonex-

clusive service areas revealed that too few persons enrolled in each Plan and therefore each Plan's pool of insureds was too small to be effective in transferring and spreading risk. *Id.* ¶ 17; (2) the exclusive service areas enabled the Plans to develop actuarially sound rates and to avoid the problems of adverse selection. *Id.* ¶ 21; (3) the exclusive service areas minimized health care costs because the Plans' ability to bargain effectively with providers in negotiating contracts was enhanced when only one Plan operated in a single service area. *Id.* ¶ 19; (4) the exclusive service areas promoted economies of scale that reduced the Plans' start-up and administrative expenses, thus helping to maintain a non-profit prepaid hospitalization plan at the lowest cost. *Id.* ¶ 18; and (5) use of exclusive service areas minimized public confusion about the Blue Cross name and symbol, and enabled the Blue Cross Commission and its Member Plans to develop a product associated with a single, uniform standard of quality. *Id.* ¶ 20.

In his affidavit, Marvin C. Reiter General Counsel of BCBSA, testifies that BCBSA today still adheres to the policy adopted over forty-five years ago by the Blue Cross Commission that the Plans should use the names and symbols in exclusive service areas. As the owner of the Blue Cross and Blue Shield names and symbols, BCBSA imposes the exclusive service areas on the Maryland and D.C. Plans and other Member Plans as a condition of the licensing agreements that authorize the Plans to use those names and symbols. Paper # 48 Ex. B, ¶¶ 3–4. Mr. Reiter asserts the exclusive service areas play a vital role in ensuring that the Plans offer high quality, lowcost insurance coverage to provide a competitive service-based option in the marketplace, and thereby enhance the value of the Blue Cross and Blue Shield names and symbols. *Id.* ¶ 6.

The defendants have also offered the affidavit of Thomas Sherlock. Mr. Sherlock was president and chief executive officer of BCBSM from 1973 until 1985. He testifies that, although BCBSM's marketing department expressed interest from time to time in marketing across the boundary, he determined not to pursue this course of action because he deemed it unwise and because it was prohibited by the agreement with BCBSA. Paper # 48, Ex. C at ¶¶ 7–8.

Both parties submitted testimony given by John F. Fritz before the Maryland Health Services Cost Review Commission. *See* Paper # 40, Att. P; Paper # 48, Ex. G. Mr. Fritz presented a study of the medical and hospital insurance coverage available in Maryland to the Commission on behalf of BCBSM.

*Other Evidence*

The bulk of the other materials presented to the court consists of memoranda and other internal documents received by plaintiff from the defendants in discovery. These documents concern efforts by BCBSM to market across the boundary. *See e.g.* Paper # 40, Att. O.

*The McCarran Ferguson Act Exemption*

1. Background

Historically, the states, and not the federal government, have regulated the insurance industry. For many years federal involvement was precluded by the Supreme Court's holding in *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869) that insurance transactions were not interstate commerce. In *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), however, the Court reversed itself and declared that the "business of insurance" was subject to the federal antitrust laws. The defendants in *South-Eastern* were an association and its membership of 200 private stock fire insurance companies and 27 individuals whom the government had charged with various violations of the Sherman Act including price fixing and restraint of trade. The district court dismissed the indictment and the government appealed. The Supreme Court reversed the lower court, holding that Congress did not intend defendants' conduct should be ex-

empt from the antitrust laws. 322 U.S. at 553, 64 S.Ct. at 1173–74.

Congress passed the McCarran Ferguson Act, 15 U.S.C. §§ 1011–13 ("the Act") in response to widespread concern that the states would no longer be able to regulate the insurance industry after *South-Eastern.* *See* T.R. Kennedy, The McCarran Act: A Limited "Business of Insurance" Antitrust Exemption Made Ever Narrower—Three Recent Decisions, 18 THE FORUM 528, 529 (1983). The Act stated that the "continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. It also declared that the federal antitrust laws were inapplicable to the business of insurance when it was regulated by the states. *Id.* at § 1012(b). Finally, the Act indicated that the exemption did not apply to agreements or acts of "boycott, coercion or intimidation." *Id.* at § 1013(b).

Recently, the Supreme Court has decided three cases defining and limiting the antitrust exemption set out in the McCarran Ferguson Act. The first of the three was *Group Life and Health Insurance Co. v. Royal Drug,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In *Royal Drug* nonparticipating pharmacists sued, alleging that certain pharmacy agreements between defendant Blue Shield and participating pharmacies constituted illegal price fixing. The district court granted summary judgment for the defendants, finding that the agreements related to the coverage and benefits provided by the insurance policy. The district court concluded that the agreements concerned the "interpretation and enforcement" of the policy and the "relationship between insurer and insured" and, accordingly, fit within the "business of insurance" as that term had been defined by the Supreme Court in *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The Fifth Circuit reversed and the Supreme Court affirmed.

In an opinion by Justice Stewart, the Court observed that Congress' primary concern in enacting the McCarran Ferguson Act was to insure the continued regulation of the insurance industry by the states. A secondary concern was to give the industry a limited exemption to the antitrust laws. 440 U.S. at 218 n. 18. Keeping in mind the intent to give only a limited exemption, the Court went on to conclude that the pharmacy agreements in issue were wholly separate from the insurance contracts between Blue Shield and its insureds and involved no "underwriting or spreading of risk", factors the Court believed were "indispensable characteristics" of insurance. *See* 440 U.S. at 211–12.

The Court clarified its *Royal Drug* holding in *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). The plaintiff in *Pireno* was an individual chiropractor. He brought an antitrust suit against a health insurance company, alleging that its practice of referring all policyholder claims for chiropractic services to a peer review committee of the state chiropractic association for a determination of whether the treatment was reasonable and the fees customary and reasonable constituted price fixing. The district court granted summary judgment for the defendant finding that the peer review committee practice constituted the "business of insurance" and, therefore, was exempt from antitrust scrutiny under the McCarran Ferguson Act. The Court of Appeals for the Second Circuit reversed and the Supreme Court affirmed.

Writing for the majority, Justice Brennan identified three criteria relevant to the determination of whether a particular practice constituted the business of insurance. In order to fall within the exemption a practice must: 1) have the effect of transferring or spreading a policyholder's risk; 2) be an integral part of the policy relationship between the insurer and the insured; and 3) involve only entities in the insurance industry. 458 U.S. at 129. Justice Brennan went on to apply these criteria to the peer review committee practice. He first determined that the risk spreading factor was not met because the committee's work took place after the risk had been transferred. Next, he found that the practice was

separate and distinct from the relationship between the insured and the insurer because the policyholder had no interest in why his claim was paid but only in whether it was paid. Finally, Justice Brennan found that the practice involved entities (the peer review committee) who were not members of the insurance industry. He did note, however, that this criterion, while important, was not dispositive.

The last case in the trilogy is *St. Paul Fire and Marine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). In *St. Paul,* the Court had its first opportunity to construe the § 3(b) boycott exception to the exemption. The plaintiffs in *St. Paul* were a group of licensed physicians practicing in Rhode Island. They sued four insurance companies writing malpractice insurance in the state alleging that three of the four refused to deal on any terms with the policyholders of the fourth as a means of compelling them to submit to new ground rules adopted by the fourth. Specifically, the fourth company and determined that it would no longer offer occurrence basis insurance but would provide only claims basis policies. The district court dismissed the case as barred by the McCarran Ferguson Act and the Court of Appeals reversed. The Supreme Court affirmed, holding that an organized refusal to deal with policyholders which was not authorized by the state's insurance laws was actionable under the Sherman Act. 438 U.S. at 552.

 Taken together, these three cases and the statutory language established a three-part test for entitlement to the exemption. The challenged practice must: 1) constitute the business of insurance; 2) be regulated by state law, and 3) not amount to boycott, coercion or intimidation. *Pireno,* 458 U.S. at 124, 102 S.Ct. at 3006. With respect to the first prong of the test, the Supreme Court has directed district courts to employ three criteria in making their decisions. Those criteria are:

> [F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the

practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities in the insurance industry.

458 U.S. at 129, 102 S.Ct. at 3009. The Court recently reaffirmed these criteria in *Metropolitan Life Insurance Co. v. Massachusetts,* —— U.S. ——, ——, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985). Accordingly, the court will proceed to apply these factors and criteria to the allegations before it.

2. The Business of Insurance

a. Risk transferring or spreading

The State asserts that defendants' market allocation scheme is unrelated to underwriting or ratemaking because the particular territories have no actuarial relevance. It cites the court, *inter alia,* to a 1974 memorandum in which a Maryland Blue Cross official stated that the territorial division "does not have any foundation in factual reason..." *See* Paper # 24, Ex. C. The State asserts that actuarial relevance is required to meet the first prong of the *Pireno* "business of insurance" test. *See* Vance Aff. Paper # 40, Att. A. It acknowledges that there are no cases with substantially similar facts in which courts have found the exemption unavailable but argues that a number of cases are persuasive by analogy.

Defendants disagree with the State for several reasons. First, they submit that underwriting considerations do not have to underlie a challenged policy in order for the exemption to apply. They point out that the statutory language exempts the "business of insurance" not the "business of underwriting." Second, they argue that actuarial relevance of the particular boundary is not required. They submit that territorial allocation is always related to risk spreading because it defines the pool of insureds. Whether the particular pool created is optimal should not be the concern of a court. The caselaw merely requires a *relationship* to risk spreading. Finally, if the court finds that *Pireno* does require

that a challenged territorial allocation have actuarial relevance, the defendants contend that the particular territories at issue here have actuarial significance.

The State believes that a recent Fourth Circuit case involving the Blues, *Ratino v. Medical Service of the District of Columbia*, 718 F.2d 1260 (4th Cir.1983), is analogous to the case at bar. In *Ratino*, a surgeon brought suit against Blue Cross, a hospital and the officers of a county medical society alleging that the insurance plan offered by Blue Cross which included a provision for peer review of medical charges constituted price fixing in violation of the Sherman Act. Judge Ramsey of this Court granted summary judgment on behalf of the defendants and plaintiff surgeon subsequently took an appeal. The Fourth Circuit found that the peer review practice did not constitute the "business of insurance" because it was indistinguishable from the peer review provisions discussed in *Pireno*. Similarly, in *Hahn v. Oregon Physicians Service*, 689 F.2d 840 (9th Cir. 1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983), the court ruled that a refusal to reimburse for treatment of podiatrists was not the business of insurance because there was no evidence that there were any *"bona fide* risk-related reasons for an insurer to distinguish between the service of M.D.s and podiatrists..." 689 F.2d at 843. *See also Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (refusal to reimburse for care by psychologists unless billed through a physician not the business of insurance). The court notes that these cases involve fact patterns very similar to those the Supreme Court addressed in *Royal Drug* and *Pireno* and fairly dissimilar to the facts at bar.

The only case addressing horizontal market allocation among insurance companies which the parties and the court have been able to locate is *Owens v. Aetna Life and Casualty Co.*, 654 F.2d 218 (3d Cir.1981). The plaintiff in *Owens* was an insurance broker. He sued Aetna alleging that it had withdrawn from the medical malpractice market pursuant to a market allocation agreement with other insurance companies. The majority of the appeals panel affirmed the trial court's grant of summary judgment for the defendants primarily on the ground that the plaintiff had presented no evidence of conspiratorial intent. The State calls the court's attention to a dissent by Judge Sloviter in which he found that market allocation agreements among insurance companies are generally not the business of insurance and accordingly, not protected by the McCarran Ferguson Act. *See* 654 F.2d at 233–47. Specifically, Judge Sloviter observed that pooling agreements between insurance companies contribute to risk spreading while agreements to divide markets would appear to have the opposite result. 654 F.2d at 241–42. The State concurs in Judge Sloviter's view. *See* Vance Aff. Paper # 40, Att. A.

In light of the paucity of authority on horizontal market allocation agreements in the insurance industry, the State suggests that the court utilize the "peculiar to the insurance industry" standard employed by other courts. *Perry v. Fidelity Union Life Insurance Co.*, 606 F.2d 468, 470 (5th Cir.1978). The State submits that most insurance activities which are unique to the industry involve risk spreading or underwriting. For example, the evaluation of risks and the setting of charges that constitute ratemaking is clearly an activity peculiar to the business of insurance. *Royal Drug*, 440 U.S. at 214, 99 S.Ct. at 1074–75. Conversely, the financing arrangements for insurance premiums are not peculiar to the industry because the extension of credit is not unique or integral to the contract of insurance. *Homestead Mobile Homes, Inc. v. Foremost Corp.*, 603 F.Supp. 767, 772 (N.D.Tex.1985). The State submits that market allocation is not unique to the industry and that it does not involve risk spreading.

The defendants offer a number of arguments in response. Their primary argument is that, as a matter of law, the defining of a pool of insureds involves risk

spreading. They believe the particular pool chosen is irrelevant because actuarial relevance is not required. They rely on a Ninth Circuit case, *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928 (9th Cir. 1983). In *Feinstein*, a group of physicians sued the insurance agent and the carriers who provided medical malpractice insurance to members of the local medical association. The question before the court was whether the defendants' domination of the malpractice market, through their agreement with the medical association, was immune from the antitrust laws. The court applied the three business of insurance criteria listed in *Pireno* and concluded that the criteria had been met.

The agreement at issue in *Feinstein* was an exclusive agency contract between the medical association and the defendant agent. The agreement provided that the agency would be the "sole and exclusive agent approved by the association." 714 F.2d at 930. In return, the agency agreed to provide malpractice insurance to all association members, regardless of specialty. In order to purchase insurance through the agency, an individual physician had to be a member of the association but member physicians could purchase insurance from any other agency they wished. The court found that this agreement was related to risk spreading because it maximized the risk pool of medical specialties. 714 F.2d at 932. It further found that this activity was the type of cooperative ratemaking that was contemplated by the proponents of the McCarran Ferguson Act. *Id.*

Defendants next cite the court to a Fourth Circuit case, *Mackey v. Nationwide Insurance Co.*, 724 F.2d 419 (4th Cir.1984). In that case, an insurance agent sued an insurance company with whom he was affiliated alleging that the company's policy of "redlining" or declining to sell insurance policies in predominantly black neighborhoods constituted a violation of the antitrust laws. The Fourth Circuit affirmed the trial court's finding that the McCarran Ferguson Act barred the claim. Without analysis, the court concluded that redlining constituted the business of insurance. De-

fendants assert that the court reached this decision because redlining is related to the particular types of risks a company is willing to insure against.

The court believes these cases do not support defendants' argument. *Feinstein* does not stand for the proposition that *any* relationship to risk spreading is sufficient. Indeed, the court there indicated that it reached its result because the risk pooling arrangement was the type of practice Congress intended to encourage when it enacted the McCarran Ferguson Act. As the Supreme Court observed in *Royal Drug:*

> Because of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws.

440 U.S. at 205, 99 S.Ct. at 1070. This quotation indicates that Congress bestowed the limited exemption on insurance companies so that their ability to provide a necessary service would not be impaired. Accordingly, the court finds that the defendants must show more than a mere relationship to risk spreading in order to meet the first criteria. In this court's view, they must show some positive relationship to that goal.

The *Mackey* case is more troubling. The Fourth Circuit's decision that redlining constitutes the business of insurance could be read to mean that any insurance company decision about who to insure or not insure is protected by the McCarran Ferguson Act. That reading, however, is inconsistent with the legislative history of the Act which indicates that Congress intended to encourage, not discourage, provision of insurance services. While it is possible that redlining reflects an insurance company's belief that it is not economical to insure a certain segment of the population, it is equally possible that such a practice is motivated solely or partially by noninsurance considerations such as racial animus. The

absence of analysis in the *Mackey* opinion renders the holding difficult to apply and interpret to the fact situation presently before the court.

Defendants' next argument is that the State's emphasis on underwriting is misplaced. They contend that many other courts have found practices not directly related to underwriting to constitute the business of insurance because these practices relate to the marketing and sales of insurance policies. A representative case espousing this position is *Thompson v. New York Life Insurance Co.*, 644 F.2d 439 (5th Cir.1981). In that case, the court upheld a trial court's decision that the provisions of an insurance agency contract which precluded the agent from engaging in any other business or occupation without written consent of the company were exempt under the McCarran Ferguson Act. The court found that the exclusivity clause was the business of insurance because it encouraged the agent to "focus all his entrepreneurial skills solely on selling insurance." 644 F.2d at 444. *See also Hopping v. Standard Life Insurance Co.*, 1984–1 Trade Cas. (CCH) ¶ 65,814 at 67,411 (N.D. Miss. Sept. 14, 1983) (restriction placed on insurance agent's activities part of "business of insurance" when "intended to prevent activity, by him, which could … reduce the effectiveness of the marketing strategy created by the Blue Cross/Standard Life agreement."); *Gribbin v. Southern Farm Bureau Life Insurance Co.*, 1984–1 Trade Cas. (CCH) ¶ 65,798 at 67,342 (W.D.La. Jan. 3, 1984) ("the contractual provision constituted the business of insurance because it was designed to inspire the agent to focus all of his efforts and skill solely on selling insurance"). In addition, some years ago the Supreme Court stated that the "selling and advertising of policies is part of the business of insurance." *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969). The court notes that the Court decided the *National Securities* case many years before *Royal Drug* and *Pireno*, cases purporting to narrow the "business of insurance" definition.

The defendants argue that the territorial allocation between them is related to the marketing and sale of insurance. They submit that the Maryland Blues do not have provider contracts with physicians and hospitals outside of their designated area. The same holds true for the District of Columbia Blues. The court takes notice of the fact that that pattern has existed for many years. It is difficult to reconcile the Blues' argument, however, with the admonition in *Pireno* and *Royal Drug* that contractual arrangements with health care providers designed solely to reduce costs are not sufficient to meet the business of insurance requirement. *See e.g. Pireno*, 458 U.S. at 132, 102 S.Ct. at 3010.

■ Accordingly, the court holds that in order to meet the first *Pireno* requirement the defendants must show the challenged territorial allocation is related positively to underwriting and ratemaking; that is, that exclusive geographic territories directly facilitate risk spreading and transfer through the provision of insurance. This holding is consistent with the State's position.

■ With this holding in mind, the court finds that partial summary judgment is not appropriate. The parties have submitted affidavits which raise material factual issues. The plaintiff's affidavit contains an expert's opinion that evidence he has seen compels the conclusion that the exclusive territories are a marketing decision, unrelated to underwriting and ratemaking. Defendants' affiants take the opposition position. Accordingly, resolution of this issue must await the trial.

b. Contractual relationship between the insured and the insurer

Plaintiff argues that the market allocation is not "an integral part of the policy relationship between the insurer and the insured." *Pireno*, 458 U.S. at 129, 102 S.Ct. at 3008–09. It submits that in order to meet this criterion, a practice must involve the type of coverage or benefits

available to an insured or insurance rates. A tangential relationship to the insured/insurer relationship that does not affect a benefit conferred is insufficient. *See Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476, 483 (1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

Again, defendants offer a number of arguments in support of the opposite position. First, they submit that *Anglin v. Blue Shield of Virginia,* 693 F.2d 315 (4th Cir.1982) stands for the proposition that any suit alleging antitrust injury to the insured satisfies the second *Pireno* criterion. *Anglin* involved an individual's challenge to defendant's policy of permitting only enrollment as an individual or as a family. The plaintiff wanted to enroll himself and his minor son but not his wife because she already had other health insurance through her employment. The district court dismissed the case and the Fourth Circuit affirmed. In its analysis of the second *Pireno* criterion the court said the following:

> The allegations in the plaintiff's complaint are the very essence of the relationship between insurer and policyholder. He has alleged that Blue Cross/Blue Shield has refused to offer the exact coverage that he prefers.

693 F.2d at 320.

The court believes the defendants are reading *Anglin* more broadly than the Fourth Circuit intended. That court did not say that any alleged antitrust violation which harms a policyholder meets the second *Pireno* criterion. Instead, as indicated above, it noted that the particular injury alleged in the case was denial of *the type of coverage* desired. When read carefully, *Anglin* actually supports the State's position rather than the defendants' position.

Defendants next argue that the territorial allocation goes to the core of the relationship between the insured and the insurer because it determines to whom the insurer will offer a policy. *See e.g. Gribben,* 1984–1 Trade Cas. (CCH) ¶ 65,798 at 67,342. They assert that a practice which impacts

on an insurance company's relationship with a prospective policyholder meets the second *Pireno* test. *See Mackey,* 724 F.2d at 420. Plaintiff disagrees, arguing for a more restrictive interpretation. It submits that the Blues' exclusive marketing areas do not have any direct impact on the risk spreading or insurance aspects of their relationship with insured persons. In fact, the areas mean that a particular Blues plan does not have any relationship at all with certain potential insureds.

In discussing the insured/insurer aspect of the McCarran Ferguson inquiry, the Supreme Court has referred to "the type of policy which could be issued, its reliability, interpretation, and enforcement" as the "core" of the business of insurance. *Metropolitan Life Insurance Co. v. Massachusetts,* —— U.S. ——, 105 S.Ct. 2380, 85 L.Ed.2d 728 *citing, SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969). The court believes the decision not to market at all in a particular geographic area is one step removed from the aspects of the insured/insurer relationship mentioned above. Accordingly, it does not believe defendants have demonstrated that the exclusive marketing areas meet the criterion.

The defendants also suggest that the exclusive marketing areas have an impact on insurance rates which in turn affect the insured/insurer relationship. There is both contradictory and insufficient evidence on this point for the granting of summary judgment.

c. Entities within the insurance industry

■ The last element of the *Pireno* test has sparked a particularly heated argument between the parties. Before proceeding to evaluate the two positions, the court notes that this last criterion should be given somewhat less weight than the previous two. In *Pireno,* Justice Brennan said,

> We may assume that the challenged peer review practices need not be denied the sec. 2(b) exemption *solely* because they involve parties outside the insurance in-

dustry. But the involvement of such parties, even if not dispositive, constitutes part of the inquiry mandated.

458 U.S. at 133, 102 S.Ct. at 3011.

Plaintiff takes the position that BCBSA is not an entity in the insurance industry because it does not underwrite insurance policies. The State has submitted factual data indicating BCBSA is a nonstock, nonprofit association composed of local Blue Cross/Blue Shield plans. There are approximately 97 such plans. The BCBSA performs a number of functions including negotiating the federal employee program and performing various trade association functions such as education, representation, and support services for its members. Paper # 14, Ex. F.

Defendants interpret the factual data in Exhibit F differently. They assert that the exhibit shows that the BCBSA has no legal identity outside of its members. They reason that, because the members are insurance companies, BCBSA is an entity in the insurance industry. They point out that the *Pireno* criteria and the caselaw do not require that all parties involved in a challenged practice be insurance companies. *See e.g. Feinstein,* 714 F.2d at 932 (*Pireno* satisfied where only role of noninsurer is in negotiating terms of policy relationship between insured and insurer and gravamen of complaint is lack of competition in insurance market itself).

The court finds itself in agreement with the defendants. The thrust of the complaint here is that the local Blues, through their national association, have attempted to limit competition in the Maryland market. In addition, the BCBSA is more intimately related to insurance companies than was the medical association in *Feinstein.* The court finds that the State's reading of the last *Pireno* criterion is very limited and does not accord with the statutory language or caselaw. The court is satisfied that the BCBSA is sufficiently related to the insurance company parties to be considered an entity in the insurance industry.

**3. The State Regulation Requirement**

**a. Unfair trade practices statutes**

The State argues for a somewhat strict construction of the state regulation requirement. It submits that the McCarran Ferguson exemption is available only when the specific conduct at issue is regulated by state law. It observes that many of the Maryland statutes aimed at insurance companies do not apply to the Blues who are nonprofit health insurers. Specifically, the State argues that the applicable statutory scheme dealing with unfair trade practices by nonprofit health insurers, Md. Code Ann. art. 48A § 354C, is scant at best. In the State's view, that statute does not regulate the practices at issue here. *See St. Paul Fire and Marine Insurance Co. v. Insurance Commissioner of Maryland,* 275 Md. 130, 339 A.2d 291 (1975) (interpretting language in Md.Code Ann. art. 48A, § 234A identical to that in art. 48A, § 354C to exclude market allocation restraints that do not have a class based animus).

The State believes that its interpretation of the state regulation requirement is consistent with the legislative history of the McCarran Ferguson Act. It cites the court to floor comments by Messrs. McCarran and Ferguson explaining the provisions of the legislation to their colleagues.

Mr. FERGUSON. I believe that a statement as to the fair construction of the act would add to the helpfulness of what the Senator from Nevada has said. There are certain things which a State cannot interfere with. It cannot interfere with the application of the Sherman Act to any agreement to boycott, coerce, or intimidate, or an act of boycotting, coercion, or intimidation.

Mr. MCCARRAN. Not at any time.

Mr. FERGUSON. Not at any time.

Mr. MCCARRAN. Nor is the control of those matters under the specified antitrust acts [the Sherman, Clayton, and Federal Trade Commission Acts] removed at any time.

Mr. FERGUSON. That is correct. After the moratorium has expired, if a

State has not legislated on the subjects covered by the three acts to which reference has been made those acts shall be applicable to the business of insurance. *But insofar as the State is concerned which has specifically legislated on the subject, the three acts shall not apply.* 91 Cong.Rec. S1443 (daily ed. February 26, 1945) (emphasis added). On the following day, Senator Ferguson reiterated this point in a discussion of the necessary extent of state legislation and its effect:

> In other words, under the terms of the bill, there are six things on which a State could not legislate. They are boycott; coercion, or intimidation, or agreements to boycott, coerce, or intimidate. But with respect to anything else, if the States were *specifically to legislate upon a particular point* and that legislation were contrary to the Sherman Act, the Clayton Act, or the Federal Trade Commission Act, then the State law would be binding.

91 Cong.Rec. S1481 (daily ed. February 27, 1945) (remarks of Senator Ferguson) (emphasis added).

The defendants take a different approach. They argue that the state regulation requirement is satisfied where state regulation of the insurance industry is general and pervasive. *Mackey,* 724 F.2d at 421; *Anglin v. Blue Shield of Virginia,* 510 F.2d 75, 79 (W.D.Va.1981). In *Mackey,* the Fourth Circuit made the following observation.

> The Sherman Act applies generally to the business of insurance only in those states in which it is not regulated by local law. A body of state law which proscribes unfair insurance practices and provides for administrative supervision and enforcement satisfies the state regulation requirement of the exemption.

724 F.2d at 421.

Relying on *Federal Trade Commission v. National Casualty Co.,* 357 U.S. 560, 564, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958) and *Dexter v. Equitable Life Insurance Society,* 527 F.2d 233, 236 (2d Cir.1975), the defendants submit that it is of no consequence that the Maryland legislature has chosen not to prohibit the type of behavior its Attorney General now complains of. They argue that the purpose of the McCarran Ferguson Act was to permit the states to continue to regulate insurance companies in any way they thought appropriate. The Ninth Circuit had this to say about the matter.

> It is not necessary to point to a state statute which gives express approval to a particular practice; rather, it is sufficient that a state regulatory scheme possess jurisdiction over the challenged practice.

*Feinstein,* 714 F.2d at 933.

The court believes defendants have the better argument on this point. The Fourth Circuit's position on this issue is clear. General and pervasive regulation is sufficient. *See Mackey,* 724 F.2d at 421; *Anglin,* 510 F.2d at 79; *see also In Re Workers' Compensation Insurance Antitrust Litigation,* 574 F.Supp. 525, 533 (D.Minn. 1983).

#### b. the Maryland Antitrust Act ("MAA")

The State believes, as the second count of its complaint indicates, that the Maryland Antitrust Act ("MAA"), specifically Md.Com.Law Code Ann. § 11–204(a)(1), applies to the Blues. They reject the defendants' assertion that the MAA is inapplicable by virtue of § 354 of the Maryland Insurance Code. Similarly, they reject BCBSM's contention that the insurance exemption provision of the MAA, Md. Com.Law Code Ann. § 11–203(4), takes this case outside of the MAA. In spite of their belief that the MAA applies, the State nonetheless contends that state antitrust regulation is not the type of regulation contemplated by the McCarran Ferguson Act.

Section 354 of the Maryland Insurance Code provides in pertinent part:

> (a) Any corporation without capital stock heretofore or hereafter organized for the purpose of establishing, maintaining and operating a non-profit health service plan ... shall be governed and regulated by

the provisions of this subtitle, and by no other law relating to insurance unless such law is referred to under this subtitle and no law hereafter enacted shall apply to such corporations, unless they are expressly designated therein, and specifically refer to such corporations. Md.Com.Law Code Ann. 48A(a), § 354. The Maryland Blues argue that the last clause of the statute prohibits application of the MAA because that statute was enacted after § 354. The State asserts that § 354 should be interpreted only to prohibit application of any later enacted *insurance* laws to nonprofit health services plans. The court believes the State's interpretation is more reasonable and consistent with the statutory context than that proposed by the defendants.

The insurance exemption to the MAA, Md.Com.Law Code Ann. § 11–203(4), exempts the activity of:

> An insurer, insurance agent, insurance broker, public adjuster, insurance adviser, or rating organization to the extent that the activity is subject to regulation by the Commissioner of Insurance of the State or is authorized by the Insurance Code or any other law of the State, including the making of or participating in joint underwriting ·or joint reinsurance arrangements.

The defendants argue that this provision exempts them from the substantive provisions of the MAA because their activities are regulated by the Insurance Commissioner. The State disagrees, noting that unfair trade practices of nonprofit health insurers are not regulated by the Commissioner.

▮ Assuming that the State is correct, a question arises as to whether the state's antitrust laws are sufficient to meet the state regulation requirement for the McCarran Ferguson Act exemption. As indicated earlier, the State does not believe the antitrust proscriptions meet the requirement. Defendants disagree citing *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir.1983). The plaintiff

in *Klamath* was a trade association of pharmacists. It sued a health care provider and its pharmacy alleging that the provider's prescription program cut into members' business. The court found that the McCarran Ferguson exemption applied. In its discussion of the state regulation requirement, the court noted that Oregon's antitrust laws applied to the practice in issue and indicated that fact was significant. 701 F.2d at 1287.

The court believes the defendants are correct. In enacting the McCarran Ferguson Act, Congress was not concerned with the particular label a state assigned to its laws but with whether a state would remain free to regulate insurance companies as it saw fit. In this instance, the Maryland legislature has seen fit to regulate certain practices in the context of its insurance laws and others in the context of its antitrust laws. The label given to a particular regulatory provision should not be controlling.

### 4. The Boycott Exception

▮ The State contends that the horizontal market allocation agreements constitute a boycott as that term is defined in *St. Paul Fire and Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). *See supra* at p. 11. (discussion of facts in *St. Paul*). While it acknowledges that the facts of the two cases are different, the State submits that the practical impact, a refusal to deal with a certain class of customers, is identical.

The defendants disagree. They submit that market allocation does not fall within the *St. Paul* rule nor does it comport with the traditional antitrust concept of boycott. They argue that *St. Paul* involved an attempt to monopolize which is not present here. While only one Blues Plan operates in any one area of the state, a variety of other insurance companies offer their services to the consumer.

The court does believe the *St. Paul* case is distinguishable. The agreement between the defendants in this action is not a boycott as that term is usually used in the

antitrust field. It is merely an agreement to divide markets. Accordingly, the court concludes that the boycott exception to the McCarran Ferguson Act exemption is not applicable in this case.

*Summary*

Accordingly, the court will deny the pending motions. It reaches this decision because it believes material factual disputes preclude any legal finding at this time as to whether defendants' exclusive marketing areas policy meets the "business of insurance" requirement for the McCarran Ferguson exemption. The court, however, does make the following findings as a matter of law: 1) that defendant BCBSA is an entity in the insurance industry; 2) that the practices at issue here are regulated by state law; and 3) that the practices do not constitute a boycott.

For the foregoing reasons, it is this 16th day of September 1985, by the United States District Court for the District of Maryland,

*ORDERED:*

(1) that plaintiff's motion for partial summary judgment be, and the same hereby is, *Denied;*

(2) that defendants' motions to dismiss and for judgment on the pleadings, herein treated as motions for partial summary judgment, be, and the same hereby are, *Denied;* and

(3) that the Clerk of the Court mail copies of this memorandum and order to the parties.